**SAMUEL T. ISAAC & ASSOCIATES, INC.**

v.

**The UNITED STATES.**

No. 542–82C.

United States Claims Court.

Jan. 14, 1985.

Teresa Ann Isaac, Lexington, Ky., attorney of record, for plaintiff.

Kenneth Oestreicher, Washington, D.C., with whom was Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., for defendant. David M. Cohen, Director, and Sandra P. Spooner, Asst. Director, Washington, D.C., of counsel.

## OPINION ON DEFENDANT'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

In this suit Samuel T. Isaac & Associates (STI or plaintiff), seeks damages in an unspecified amount for the improper termination by the Government National Mortgage Association (GNMA) of 15 Guaranty Agreements under GNMA's Mortgage Backed Securities Program (MPSP).

Each agreement stated that it was entered into pursuant to § 306(g) of the National Housing Act, whereunder GNMA was authorized to guarantee the timely payment of principal of and interest on securities based on and backed by a pool of federally insured mortgages. The agreement recited that the issuer, STI, had theretofor originated or otherwise acquired and was the owner of a pool of mortgages eligible for guarantee by GNMA and had authorized the issuance of securities to be based on and backed by such pool of mortgages and to be guaranteed by GNMA. The issuer transferred all of its right, title and interest in and to the mortgages to GNMA, and GNMA guaranteed the timely payment of the principal and interest set forth in all of the securities which the issuer sold to acquire the mortgages. (Guaranty Agreement §§ 3.01, 6.01.) The issuer was to administer both the securities and mortgages. With respect to the securities, it was to remit to the holders all payments of principal and interest to be made under the terms and conditions of the securities and to maintain registered ownership and other records. With respect to the mortgages, it was to service them by pursuing collection of payments, foreclosing defaulted mortgages and doing whatever else was necessary and incidental to protection of the mortgagee's interests. (*Id.* at §§ 3.01, 4.14.) However, in the event of nonpayment of the interest or principal, the issuer was not personally liable to the security holders, their sole recourse being against the pooled mortgages and GNMA guarantees thereon. (*Id.* at §§ 7.01, 7.02.)

STI's compensation on the transactions was derived from the difference between proceeds of the sale of the securities to investors and the amounts it advanced on the mortgages, and, in addition, a servicing fee which it was entitled to retain in a fixed percentage of the payments made by the mortgagors. After the mortgages were conveyed to GNMA, plaintiff's only financial interest in the agreement was the right to receive the servicing fee over the terms of the mortgages.

In addition to provisions for default for the failure of the issuer to remit any payment for the securities holders, for the insolvency of the issuer, and for the failure of the issuer to comply with the terms of the agreement, another provision empowered GNMA to declare the issuer in default if there was "any change with respect to the business status of the Issuer [STI] * * which materially adversely affect GNMA under this agreement." (*Id.* at § 8.03(2).) On the occurrence of an event of default, GNMA had the right, by letter directed to the issuer, to extinguish any interest, equitable or legal, held by STI in the pooled mortgages, and the mortgages would then become the absolute property of GNMA, subject only to the unsatisfied rights of the holders of the guaranteed securities backed by the mortgages. (*Id.* at § 8.05; *see also* 12 U.S.C. § 1721(g) (1982)); *Consolidated Mtg. & Finance Corp. v. Landrieu,* 493 F.Supp. 1284 (D.D.C.1980); and *New York Guardian Mortgage Corp. v. Cleland,* 473 F.Supp. 422 (S.D.N.Y.1979).

On September 2, 1980, GNMA issued a notice of default and termination to STI due to its continued issuance of dishonored checks to securities holders. In the notice GNMA asserted that the issuance of the dishonored checks "provides substantial indication of a change in the business status of the issuer which materially adversely affects GNMA under each of the guaranty agreements." *See Samuel T. Isaac & Associates v. United States,* 3 Cl.Ct. 528, 529

(1983) (hereinafter *"Isaac I"*).[1] Plaintiff contests this allegation of fact and complains, *inter alia,* that the dishonored check which triggered the default was due to bank error. However, this factual dispute need not be resolved at this time because it is not the subject of the government's pending renewed motion for partial summary judgment.

On January 19, 1984, Samuel T. Isaac, who controls and is plaintiff's alter ego, pleaded guilty to two separate indictments and an information in three different federal district courts, charging Isaac with fraud, embezzlement, obtaining money by false pretenses and other similar financial crimes committed from 1976 through 1982. *See Samuel T. Isaac & Associates v. United States,* 5 Cl.Ct. 490, 491–92 (1984) (hereinafter *"Isaac II"*). On June 1, 1984, the government filed a motion for partial summary judgment contending that "even though GNMA did not rely on these subsequent guilty pleas as grounds for terminating STI as a financial servicer and intermediary between mortgagor and security holders" under the MBSP, "they now provide independently sufficient grounds for GNMA's actions as a matter of law irrespective of the prior actual grounds." *Id.* at 492. This court denied the government's motion because the contract required that GNMA, not the Department of Justice, ex-

ercise the discretion with respect to whether a particular default warrants the termination of the contract. *Id.* at 493.

Subsequently, on September 18, 1984, GNMA issued to STI a reaffirmance of its earlier decision to terminate plaintiff's agreements under the MBSP. This letter stated that "GNMA concludes that your commission of the foregoing felonies while STI was a GNMA issuer constitutes a change in STI's business status materially adverse to GNMA." It concluded that prior to September 2, 1980, the integrity of the MBSP was adversely affected when STI changed its business status from "being law-abiding to that of being engaged in a pattern and practice of criminal activity involving breach of trust."[2] The letter went on to state why action other than termination of STI's contracts would not have adequately protected the interests of GNMA.

On October 4, 1984, the government renewed its motion for partial summary judgment, contending that since GNMA has now exercised its discretion to terminate STI's MBSP contracts for its criminal activity, this decision should be sustained.

Plaintiff concedes that "the guilty pleas in and of themselves are sufficient grounds for a *1984* termination." It contends, however, that these convictions cannot serve as

1. Originally defendant moved for summary judgment on its counterclaim for damages arising out of plaintiff's failure to cooperate with GNMA after the notice of default. In *Isaac I,* the court denied both the plaintiff's and defendant's motions for partial summary judgment as to the counterclaim due to a factual dispute as to whether or not GNMA's September 2, 1980, ground for termination was justified. The government's counterclaim against STI is not at issue on the current motion.

2. The letter went on to explain GNMA's decision as follows:

Such a change affected GNMA in a materially adverse way by necessity, for the integrity of its issuers is the foundation of the GNMA Mortgage-Backed Securities ("MBS") Program. Under Section 2–5(b) of the GNMA MBS Guide, GNMA requires as a prerequisite for participation in the MBS Program that applicants have in place "internal management controls * * * to assure coordination of

commitment activities, controls on the Issuer's market positions, and the competence and integrity of staff." This requirement is needed because even small issuers are entrusted with millions of dollars over the life of a mortgage pool. Issuers receive mortgagors' payments of principal and interest for pass-through to security holders; advance payments of property taxes and insurance premiums which must be held in escrow until payments are due; and mortgage insurance and guarantee claim benefit payments which also must be passed through to security holders. Accordingly, where as here management has established a pattern and practice of criminal conduct involving breach of trust, the company cannot remain in the MBS Program. The risks of monetary loss and damage to the reputation of the MBS Program are too great. Accordingly, we reaffirm our earlier decision to terminate STI as the issuer and servicer of the referenced pools.

a justification for the 1980 termination and that during the 4-year period between GNMA's termination and Mr. Isaac's convictions STI was entitled to continue to service or to sell its interest in the mortgage pools. It also argues that in any event STI is still entitled to sell its loan portfolio and receive the full amount of the proceeds.

 It is concluded, however, that defendant is correct. The government may justify a default termination of a contract by proving that at the time of the termination, an adequate ground for termination existed even though it was then unknown to the government. *College Point Boat Co. v. United States*, 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–201, 69 L.Ed. 490 (1925); *Pots Unlimited v. United States*, 220 Ct.Cl. 405, 410, 600 F.2d 790, 793 (1979); *G.C. Casebolt Co. v. United States*, 190 Ct.Cl. 783, 786–87, 421 F.2d 710, 712 (1970); *Nesbitt v. United States*, 170 Ct.Cl. 666, 670, 345 F.2d 583, 585 (1965), *cert. denied*, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966). Most of the criminal acts for which Mr. Isaac was convicted took place from 1976 through 1980. Therefore, since the government could have defaulted STI for these activities in 1980, had Mr. Isaac plead guilty to the charges at that time, the default may now be justified by Mr. Isaac's 1984 criminal convictions. It is not reasonable to construe the contract to provide a different result merely because Mr. Isaac for a time concealed from the government conclusive evidence of his prior criminal conduct.

 Plaintiff contends that the actions for which Mr. Isaac was convicted were not done with criminal intent and that his guilty pleas were motivated by his physical disability and the advice of his counsel that he plead guilty rather than endure the burdens of the criminal litigation. However, these allegations are insufficient to create an issue of fact: first, because they are not supported by affidavit;[3] and, second, because, even if they were sworn, plaintiff would be estopped to deny the facts of his criminal conduct. A prior criminal conviction establishes conclusively the facts underlying the conviction for purposes of a subsequent civil proceedings involving the same parties; and this rule of collateral estoppel is operative whether the conviction is obtained by jury verdict or as the result of a guilty plea. *Gray v. Commissioner*, 708 F.2d 243, 246 (6th Cir.1983); *Matter of Raiford*, 695 F.2d 521, 523 (11th Cir.1983); *Fontneau v. United States*, 654 F.2d 8, 10 (1st Cir.1981); *United States v. Podell*, 572 F.2d 31, 35 (2d Cir.1978).

Upon default, GNMA had the absolute right to terminate STI's interest in the mortgage pools subject to the contracts. Title 12 U.S.C. § 1721(g) provides that GNMA is empowered "to provide by contract with the issuer for the extinguishment, upon default of the issuer, of any redemption, equitable, legal or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued." Pursuant to this authority, § 8.05 of the guaranty agreement provides that in the event of default, GNMA may be letter to the issuer extinguish any right, title, or interest of the issuer in the mortgage pools. Given the potential for harm to the entire MBSP if a convicted embezzler were allowed to continue to service guaranteed loans, GNMA's decision to terminate STI's interest in the contracts cannot be deemed to be an abuse of discretion.

If plaintiff wished to salvage some value for itself by selling its servicing rights, its remedy was to proceed by way of § 5.03 of the agreements. Section 5.03 imposed on STI the duty both to notify GNMA of any impending or actual default and to set forth such corrective or remedial action as was contemplated by STI with the agreement of GNMA. Thus, when Mr. Isaac embarked on his criminal activities, it was

---

3. See Rule 56(e) of the United States Claims Court, and Federal Rule of Civil Procedure 56(e) for the United States District Courts; *see also*

*Bowser v. United States*, 215 Ct.Cl. 168, 175–76 (1977); and *Funderburg v. United States*, 207 Ct.Cl. 305, 314–15 (1975).

up to plaintiff to present to GNMA a proposal which would have allowed STI to sell its interest in the servicing of the mortgage pools and securities, or any other action it deemed appropriate prior to termination. Plaintiff does not allege by affidavit (or otherwise) that prior to the September 2, 1980, termination letter it made any such proposal to GNMA. And once the termination occurred, plaintiff had no interest to sell. *Consolidated Mtg. & Finance Corp.,* 493 F.Supp. at 1287–88. STI cannot complain about GNMA's decision to terminate, as opposed to some lesser sanction.

The pleadings and exhibits indicate that there is no genuine issue of material fact and that defendant is entitled to summary judgment on plaintiff's claim as a matter of law. Therefore, the clerk will enter judgment dismissing plaintiff's claim against the government upon final determination of the government's counterclaim.