**SAMUEL T. ISAAC & ASSOCIATES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 542–82C.

United States Claims Court.

Feb. 24, 1986.

552

Teresa Ann Isaac, Lexington, Ky., for plaintiff.

Kenneth Oestreicher, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant; David M. Cohen, Director, and Sandra P. Spooner, Asst. Director, of counsel.

**OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIM**

PHILIP R. MILLER, Judge:

### I.

In its complaint, Samuel T. Isaac & Associates (plaintiff or STI) sought damages for the termination by the Government National Mortgage Association (GNMA) on September 2, 1980, of 15 Guaranty Agreements under GNMA's Mortgage-Backed Securities Program (MBSP), pursuant to which plaintiff, as the issuer of the securities, was entitled to fees for servicing and supervising the pools of mortgages underlying the securities and disbursing monthly to the securities holders the installments of principal and interest collected from the mortgagors.

On January 14, 1985, this court granted defendant's motion for summary judgment with respect to the complaint on the ground that GNMA had properly terminated the agreements for default by plaintiff. *Samuel T. Isaac & Associates, Inc. v. United States,* 7 Cl.Ct. 255 (1985). Although defendant's counterclaim is in the sum of $700,000, defendant has abandoned $589,551 of that claim and now seeks summary judgment for the remainder: to the extent of $80,317 for sums which plaintiff wrongfully collected from mortgagors after the termination and withdrew for its own benefit from the pool Custodial Accounts from June 1981 through February 1982; and to the extent of $30,132 for GNMA's costs incurred in having to transfer plaintiff's functions to another mortgage and securities servicer. In response, plaintiff contends that GNMA's termination was not in conformity with the agreements and that in any event it was entitled to retain the $80,317 to compensate itself for outlays.

In order to evaluate properly the arguments of both sides, it is necessary to relate briefly the sequence of events in this controversy and what has already been decided.

On September 2, 1980, GNMA delivered a letter to plaintiff declaring that plaintiff had issued a check for a monthly payment due a security holder, which had been returned by the bank for lack of funds. Therefore, GNMA declared plaintiff in default of its Guaranty Agreement, pursuant to § 8.01 of that agreement, which provides that any failure by an issuer to remit a payment to a security holder shall constitute an event of default under the agreement as of the due date of such payment. The letter further stated that, because GNMA had also been informed of prior instances of plaintiff's checks being returned due to insufficient funds, it was declaring a default of each of plaintiff's Guaranty Agreements as of the date of the letter, as the continued issuance of such checks to security holders provided a substantial indication of a "change in the business status of the Issuer * * * which materially adversely affects GNMA", an additional event of default pursuant to § 8.03(2).[1]

The letter stated that as a consequence of its default plaintiff was no longer entitled to act as issuer or servicer, and the declaration of default extinguished all of plaintiff's rights and interest in the mortgages, which became GNMA's absolute property subject only to the rights of the security holders. Pursuant to §§ 8.05 and 8.06 of each agreement, it instructed plaintiff to turn over promptly to GNMA or its designee all pertinent mortgages and securities records and funds in tax, insurance, principal and interest custodial and other related accounts.

---

**1.** Section 8.03. In addition to the events of default set forth and provided for above in this Article, GNMA, in its discretion and on its election, with notice thereof in writing directed to the Issuer, may declare as an event of default under this Agreement:

  \*　　\*　　\*　　\*　　\*　　\*

(2) Any change with respect to the business status of the Issuer, * * * which materially adversely affects GNMA under this Agreement, which shall constitute an event of default only as of the date of notice as aforesaid, directed to the Issuer[.]

On September 4, 1980, GNMA officials held a meeting with Samuel T. Isaac, president, and Ralph H. Harrell, vice president of STI, concerning the decision to extinguish STI's portfolio. The conference did not change GNMA's decision.

On September 11, 1980, plaintiff filed a complaint in the United States District Court for the Eastern District of Kentucky (*Samuel T. Isaac & Associates, Inc. v. Government Nat'l Mortgage Association,* Civil Action No. 80-169), seeking damages for and injunctive relief from GNMA's alleged breach of contract in extinguishing STI's status as servicer of the 15 pools of mortgages and mortgage-backed securities.

Upon termination of the servicing contracts, GNMA proceeded with the transfer of servicing from plaintiff to a new servicer, Baldwin-United Mortgage Association of Louisville (Baldwin-United), but plaintiff refused to turn over the mortgage records and documents needed by Baldwin-United. Plaintiff wrote to the mortgagors directing them to continue making their payments to STI, while GNMA sent letters to the mortgagors telling them to pay Baldwin-United. Accordingly, GNMA filed a counterclaim in plaintiff's district court suit seeking injunctive relief.

In order to protect innocent third parties, on November 18, 1980, the district court initially offered to allow STI to continue servicing the mortgages, subject to a U.S. magistrate's supervision, on condition that STI post a $300,000 performance bond. However, the district court subsequently found that plaintiff experienced severe financial difficulties and was unable to meet the performance bond requirement. Therefore, on January 16, 1981, the district court removed the servicing of the mortgages and securities from STI and approved its transfer to Baldwin-United, under the court's supervision. But plaintiff refused to comply with the court's orders requiring it to give GNMA access to the mortgage records and to transfer all funds in its court-supervised account to Baldwin-United's court-supervised account.

On June 17, 1981, the district court entered an order denying all of plaintiff's claims for declaratory and injunctive relief and for damages other than for breach of contract, which, because of lack of jurisdiction, it transferred to the United States Court of Claims.

On plaintiff's appeal from the district court's decision of June 17, 1981, the United States Court of Appeals for the Sixth Circuit affirmed. *Samuel T. Isaac & Associates, Inc. v. Government Nat'l Mortgage Association,* No. 81-5464, (6th Cir. Dec. 11, 1981) (Unpublished Opinion).

On November 25, 1981, the district court entered judgment in favor of GNMA on its counterclaim for injunctive relief against plaintiff, which stated:

There being no genuine issue of material fact, GNMA is entitled to partial summary judgment as a matter of law on the injunctive portion of its counterclaim. This Court found by order of June 17, 1981, that GNMA had effectively terminated the 15 Guaranty Agreements which are the subject of this litigation. The termination was effected pursuant to Article VIII of the Guaranty Agreements. Plaintiff was notified of said termination by a letter of extinguishment delivered to it on September 2, 1980.

&ast; &ast; &ast; &ast; &ast; &ast;

The motion of GNMA is based upon the 15 Guaranty Agreements freely entered into between plaintiff and GNMA. Article VIII of those agreements covers default and the steps to be taken once a default has been declared. GNMA seeks to enforce the provisions of Article VIII through a motion for an injunction. The Court finds that the 15 Guaranty Agreements are controlling in this case. The motion of GNMA must therefore be granted.

IT IS THEREFORE ORDERED AND ADJUDGED:

That the motion of defendant, Government National Mortgage Association (GNMA), for summary judgment on the injunctive portion of its counterclaim enjoining plaintiff from attempting to ser-

vice or interfering in any manner with the servicing of the GNMA mortgages that were in the pools of mortgages covered by the 15 Guaranty Agreements terminated by GNMA on September 2, 1980, be and it hereby is GRANTED by a separate injunction entered this day. * *

In connection with its defense of plaintiff's claim for breach of the 15 Guaranty Agreements, transferred by the district court to the Court of Claims (and then to this court by court reorganization in 1982), defendant moved for summary judgment on the basis of plaintiff's default due to a change in STI's business status materially adversely affecting GNMA. In support of its motion, however, defendant did not rely on proof of the continued return of plaintiff's checks to security holders for lack of funds. Instead it relied on the fact that subsequent to the filing of plaintiff's suit, on January 19, 1984, Samuel T. Isaac, plaintiff's controlling stockholder and *alter ego*, had been convicted of fraud, embezzlement, obtaining money by false pretenses and other similar financial crimes, most of which had been committed between 1976 and 1980.

On January 14, 1985, this court granted defendant's motion for summary judgment, because such convictions confirmed that at or prior to the termination there had been a "change with respect to the business status of the Issuer * * * which materially adversely affect[ed] GNMA", an event that warranted termination for default under § 8.03 of the agreements. *Samuel T. Isaac & Associates, Inc. v. United States*, 7 Cl.Ct. 255 (1985).

## II.

█ Defendant now seeks summary judgment on its counterclaim, to the extent of $80,317 for sums plaintiff collected from mortgagors and used to compensate itself for various asserted expenses from June 1981 through February 1982, after the extinguishment of its interest of the mortgages and securities, and to the extent of $30,-132 for GNMA's costs incurred in connection with the transfer of servicing to another company.

Defendant relies on Article VII, § 7.04, and Article VIII, §§ 8.05 and 8.06, of each Guaranty Agreement, which state as follows:

Section 7.04. On the occurrence or development of any event of default as set forth or provided in Article VIII below, and the issuance by GNMA to the Issuer of a letter of extinguishment as set forth and provided in such Article VIII, the Issuer shall give up and forfeit, and hereby releases, to GNMA all of its right, title, and interest in and to funds then or thereafter placed in the Custodial Accounts established and maintained under Section 4.11 and Section 4.13 above, except such claims as are subject to and provided for in Section 7.05 below.

* * * * * *

Section 8.05. On the occurrence or development of any event of default as set forth or provided above in this Article, unless arrangements under Section 8.04 above are mutually agreed upon by and between GNMA and the Issuer and placed in written contractual form, GNMA may, under this Section 8.05, by letter directed to the Issuer, pursuant to section 306(g) of the National Housing Act, effect and complete the extinguishment of any redemption, equitable, legal, or other right, title, or interest of the Issuer in the mortgages pooled under this Agreement, against which the guaranteed securities hereunder are issued; and with respect to such guaranteed securities, the mortgages pooled hereunder shall become the absolute property of GNMA, subject only to unsatisfied rights of the holders of such securities based on and backed by such pooled mortgages.

Section 8.06. On and after the time GNMA directs a letter of extinguishment to the Issuer as set forth and provided in Section 8.05 above, all authority and power of the Issuer under this Agreement, whether with respect to the securities issued hereunder or the mortgages pooled hereunder or otherwise, shall ter-

minate and expire; and without limitation, the authority of the Issuer to make withdrawals against the Custodial Account established and maintained under Section 4.11 and Section 4.13 above, as provided in such Sections and Section 4.12 above, shall so terminate and expire; provided that, on request by GNMA and consistent therewith, the Issuer shall continue for a reasonable time to render GNMA the fullest assistance practicable in furtherance of the orderly and due removal of the Issuer from and the continuation otherwise of, this Agreement and the transactions and arrangements set forth and provided for herein.

Once a letter of extinguishment is sent to the issuer, pursuant to § 7.04 the issuer loses all right, title and interest in any of the funds then in the Custodial Accounts or thereafter deposited in them, and pursuant to §§ 8.05 and 8.06 the pooled mortgages become the absolute property of GNMA, and the issuer's authority to make withdrawals from any Custodial Account terminates, except in connection with assisting GNMA in effecting a transfer of the servicing.

Plaintiff's principal ground for resisting defendant's motion is stated by it as follows: GNMA had "an obligation under Section 8.04 of the Guaranty Agreements [2] to 'confer and negotiate' with STI prior to any extinguishment attempt and GNMA has breached its duty thereunder", and "Under Section 8.05, a mortgage company may not be extinguished unless GNMA has first attempted to confer and negotiate. * * * GNMA has failed to follow its own built-in due process guidelines. Therefore, GNMA's material breach of due process protections relieves STI of any obligation to pay expenses or damages to GNMA."

However, for a number of reasons plaintiff's argument must be rejected.

First, the affidavit of Ronald F. Laurent, GNMA's president, establishes that plaintiff was in fact afforded a conference and an opportunity to negotiate, on September 4, 1980, two days after the issuance of the extinguishment letter, in which three representatives of plaintiff and of GNMA participated. In his deposition Ralph H. Harrell, plaintiff's vice president, conceded that the conference lasted at least an hour. There is no showing that GNMA could not have rescinded its extinguishment letter had plaintiff made a persuasive showing at such conference that plaintiff was not at fault.

■ While plaintiff claims that it was entitled to the conference prior to any extinguishment letter, neither § 8.04 nor any other section of the agreement so provides. Indeed, § 8.04 implies to the contrary, since it qualifies the provision for the conference by the clause "unless GNMA in its discretion determines that such course is precluded by applicable circumstances." If GNMA in its discretion may omit a conference entirely, it is reasonable to interpret the section as allowing GNMA in its discretion to issue the extinguishment letter immediately if the circumstances so warrant and to hold the conference 2 days thereafter. One of the most significant features of GNMA securities is the relative certainty of prompt periodic receipt of shares of mortgage principal and interest. Section 8.01 provides specifically that any failure to remit any such payment to a security holder constitutes an event of default as of the due date of such payment. The issuance of a worthless check to a security owner casts doubt and uncertainty upon the value of GNMA bonds generally. Having grounds to believe that STI had engaged in such conduct, it was not unreasonable for GNMA to act immediately to preclude further worthless checks and to hold its conference with the issuer thereafter. Sim-

---

**2.** Section 8.04. On the occurrence or development of any event of default as set forth or provided above in this Article, GNMA and the Issuer, unless GNMA in its discretion determines that such course is precluded by applicable circumstances, will confer and negotiate with respect to remedying and correcting the default through interim moratorium or other arrangements, and any such arrangements mutually agreed upon shall be placed in written contractual form, and shall be supplementary to this Agreement.

ilarly, after Samuel T. Isaac pleaded guilty to and was convicted of crimes involving breach of trust and moral turpitude, there was no need to hold a conference to determine whether or not STI could still qualify as a financial intermediary receiving payments from mortgagors and distributing them to government guaranteed security holders; and there is no evidence that plaintiff even requested one.

■ Second, § 8.06 of the agreement provides that after GNMA directs a letter of extinguishment to the issuer, all authority of the issuer with respect to the securities and pooled mortgages shall terminate and expire, and "the authority of the Issuer to make withdrawals against the Custodial Account [to the extent permitted under other sections of the agreement] * * * shall so terminate and expire." Nothing in § 8.06 or any other provision permits the issuer to make a unilateral judgment that the letter of extinguishment was not warranted and that therefore it may withdraw funds to pay itself despite the letter. As the court stated in an earlier opinion in this case, "[I]f plaintiff desired to contest the validity of the extinguishment, its remedy was by law suit against GNMA or the government and not by defiance, by disregard of the notice, by self-help, or by threats to the mortgagors that they must continue to pay the plaintiff rather than GNMA or face double liability." *Samuel T. Isaac & Associates, Inc.*, 3 Cl.Ct. 528, 531 (1983).

■ Third, plaintiff is collaterally estopped by the November 25, 1981, decision of the district court from contending that the GNMA notice of default and extinguishment as of September 2, 1980, was not effective for such purpose. In granting injunctive relief to GNMA against plaintiff continuing as servicer, retaining custody of mortgagor payments, and paying itself for services, the district court held both that the letter of extinguishment was valid and that plaintiff was effectively removed as servicer. Accordingly, plaintiff cannot renew here its argument that the letter of extinguishment was not valid. *See Montana v. United States*, 440 U.S.

147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). The fact that the prior proceeding was for injunctive relief while the present one is for contract damages is irrelevant, as long as plaintiff had a full and fair opportunity to contest the very issue it now seeks to relitigate and the issue was actually and necessarily determined by the prior decision. *See Blonder-Tongue v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567 (Fed.Cir.1984); *Duncan v. United States*, 229 Ct.Cl. 120, 122, 667 F.2d 36, 38, cert. denied, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1981); *Armstrong v. United States*, 173 Ct.Cl. 944, 354 F.2d 274 (1965); and *Fairmont Aluminum Co. v. Commissioner*, 222 F.2d 622, 625 (4th Cir.), cert. denied, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955).

■ Thus, plaintiff was not an authorized servicer after the September 1980 termination and, pursuant to §§ 7.04 and 8.06, it was neither entitled to any fees nor to make withdrawals so as to pay itself fees; and it cannot in good faith assert it was so entitled.

Fourth, this court, having already decided that GNMA's letter of extinguishment to plaintiff on September 2, 1980, was proper and not a breach of contract by GNMA (*Samuel T. Isaac & Associates, Inc. v. United States*, 7 Cl.Ct. 255 (1985)), now holds that plaintiff had no right to withdraw any of the moneys collected from the mortgagors and deposited in the Custodial Accounts from June 1981 through February 1982, and must now return them as demanded in the government's counterclaim.

III.

Plaintiff contends that there is a material issue of fact in dispute, i.e., whether GNMA in fact suffered a loss. Plaintiff claims that because on September 2, 1980, GNMA withdrew a $290,000 balance from

the STI Custodial Accounts immediately following the extinguishment order, any loss has "most likely been recovered".

■ However, Joseph G. Wagner, an officer of GNMA, analyzed GNMA's cash receipts and disbursement ledgers pertaining to STI and stated in an affidavit that for the period September 2, 1980 through December 31, 1985, GNMA was out of pocket $231,815 as a result of STI's activities in connection with the extinguished servicing contracts. Plaintiff has not demonstrated by competent proof that there is a genuine issue of fact with respect to such loss. The mere allegations of plaintiff's pleadings and brief are not sufficient to counter the proof by affidavit provided by defendant. RUSCC 56(f). Plaintiff must set forth, by affidavit or otherwise admissible proof, specific facts showing that there is a genuine issue for trial, and, if it does not, summary judgment may be entered against it. Plaintiff offers no proof other than the fact of the government's withdrawal of $290,000 from plaintiff's Custodial Accounts on September 2, 1980, the date of termination, and its own conclusion that GNMA's losses were thereby "most likely" satisfied. Its allegation is therefore unsupported and is insufficient to establish a genuine issue for trial.

Furthermore, the damages for which defendant now seeks compensation occurred from plaintiff's having paid itself $80,317 from mortgagor payments received after, not before, GNMA withdrew the $290,000. Therefore, the court finds there is no relationship between the damages sought here and the earlier withdrawal.

## IV.

Plaintiff claims next that it is equitably entitled to keep the sums withdrawn by it from the Custodial Account ($80,317) between June 1981 and February 1982. It

**3.** Title 24 C.F.R. § 390.1 (1979):
This subpart is limited to "pass-through" securities, including (a) "straight pass-through" and (b) "modified pass-through" types, and does not purport to set forth all the procedures and requirements that apply to the issuance and guaranty of such securities. All such transactions are governed by the specific

argues that recovery of these amounts would unjustly enrich the government for the value of STI's services.

The items making up the $80,317 have been identified by Ralph Harrell, plaintiff's vice president for servicing, in his affidavit and deposition, and in admissions in pretrial proceedings, as follows:

| | |
|---|---|
| A. Servicing fees | $ 9,727 |
| B. Reimbursement of foreclosure expenses | 11,749 |
| C. Reimbursement of internal reserve | 41,500 |
| D. Security holders checks outstanding | 9,890 |
| E. Payment of corporate debt to Chemical Bank | 7,451 |
| | $80,317 |

A. *Servicing Fees.* The Guaranty Agreement gives an issuer the right to recover servicing fees from the monthly mortgage collections. Such fees are normally one-half of one percent per annum, computed on the same principal amount and for the same period as the interest portion of each installment, and are withheld from the amounts paid over to the security holders. Mortgage-Backed Securities Guide § 5–1(c).

Mr. Harrell's deposition discloses that the $9,727 claimed for servicing fees was for mortgage payments received by STI for the period June 17, 1981 through October 27, 1981, at least 9 months after GNMA had terminated plaintiff's status as servicer of the mortgage pools for default. Thus, as has already been decided, plaintiff had no right to collect the mortgage payments in question and was not entitled to the fees therefrom. Furthermore, the Mortgage-Backed Securities Guide (the Guide), the terms of which are incorporated into the agreement of the parties by the GNMA regulations,[3] provides that Baldwin-United and not plaintiff was entitled to such fees.[4]

terms and provisions of the Association's Mortgage-Backed Securities Guide and contracts entered into by the parties.

**4.** Section 11–5 of the Mortgage-Backed Securities Guide states:
*Transfer of Servicing.* Compensation for servicing the pooled mortgages as set forth in

B. *Foreclosure Expenses.* Plaintiff's claim for $11,749 in foreclosure expenses fares no better. The book entries for the withdrawals from the custodial account for this purpose were dated August 11 and 12, 1981. Plaintiff introduced no evidence as to when such foreclosures took place or that the expenses were incurred prior to the date when its interest as a servicer was extinguished and the mortgages become GNMA's absolute property. Thus the expenditures, if in fact incurred, must be deemed unauthorized, just as its right to foreclose the mortgages themselves was unauthorized after September 2, 1980.

■ In any event, even if plaintiff had the right to foreclose and incur these expenditures, it had no right to recoup them out of funds in the Custodial Account.

Section 4.12 of the Guaranty Agreement sets forth the circumstances under which the issuer may make withdrawals from the Custodial Account. It does not provide for any withdrawals for such purpose,[5] because there is no occasion for the issuer to recoup its foreclosure expenses from such source. All mortgages qualifying under the Mortgage-Backed Securities Program are insured by an agency of the United States, either the Federal Housing Authority, the Farmers Home Administration or the Veterans Administration. (Guaranty Agreement § 3.03.) When default by a mortgagor necessitates foreclosure, the issuer must make the required foreclosure expenses out of its own funds, and reimburses itself out of the insurance proceeds, rather from the Custodial Account. (Guaranty Agreement § 4.14.)[6] The only payments which it may recoup out of the Cus-

Paragraph 5–1c of this guide, and any other amounts which may have been earned by a defaulting issuer on account of the administration of said pool shall terminate as of the date of GNMA's notification of default. Upon the transfer by GNMA of the servicing to a new servicing agent, such new servicer shall be compensated for servicing and shall be entitled to such other income as may be derived from the administration of the pooled mortgages beginning on the date such servicing is transferred. * * *

5. Section 4.12. In addition to withdrawals to effect timely payment on securities outstanding under this Agreement, the Issuer may make withdrawals against the foregoing Custodial Account under Section 4.11 in order: to remit to GNMA the monthly guaranty fee set forth in Section 1.04 above; to reimburse itself or GNMA for any advances made under Section 4.03 above to effect the timely payment of securities issued under this Agreement, provided that such reimbursement, in the case of each advance, shall be only for interest and principal, separately, advanced and paid on such securities, and only from related collections or other recoveries of interest and principal, separately, received from or on account of mortgages pooled under this Agreement, which collections or other recoveries were delayed in payment, and thus made the advance necessary; to reimburse itself or GNMA for the amount of any advance over and above the amount needed for the purpose of the advance; to effect the removal from the Custodial Account of any portions deposited

therein of installments collected on the mortgages pooled under this Agreement for the purpose of the payment of late charges, or the removal of any other amounts deposited temporarily therein through error or otherwise; to compensate or pay itself, with the concurrence of and subject to and in accord with any applicable instructions and directions issued by GNMA, monthly or otherwise, either for servicing the mortgages pooled under this Agreement, or in order to recover all or any part of any interest differential between the inflow of interest funds derived from the mortgages and the outflow of interest funds paid on the securities, together with such other outflow as shall be in accord with this Section 4.12; or to clear and terminate the Custodial Account at the termination of this Agreement subject to and in accord with Section 1.03 above.

6. Section 4.14. The Issuer is hereby authorized and empowered to and shall: service the mortgages pooled under this Agreement, and pursue collections to be made thereon with due prudence and diligence; foreclose or otherwise comparably convert the ownership of properties securing such of the mortgages as come into and continue in default, subject to and consistent with related determinations made by the Issuer as provided below in this Section, or otherwise depose [sic] of such mortgages, with the purpose of liquidating such properties and mortgages; and file, process, and receive the proceeds from mortgage insurance or guaranty claims * * *.

todial Accounts are its advances of principal and interest to investors, to the extent the insurance proceeds include reimbursement of such advances and are deposited in the Custodial Account for such purpose. *See* § 4.12, note 5 *supra.*

C. *Internal Reserve.* Plaintiff is likewise not entitled to the $41,500 it claims it advanced to the Custodial Accounts as an internal reserve to insure timely payment of principal and interest to security holders.

Ordinarily a security holder is entitled to receive interest and installments of principal within 15 days after each elapsed month during which the mortgage debt is outstanding. However, if some of the mortgagors delay their payments, there may be insufficient funds in the Custodial Account from which to make payment to the investors. The issuer must make up the insufficiency by advancing its own funds or by borrowing at interest. As an alternative, for its own convenience, the issuer may provide a reserve in the Custodial Account by delaying the sale of the Mortgage-Backed securities for one month after the issuer has purchased the mortgages but nevertheless depositing that month's installment of principal and interest in the Custodial Account. Forty-five days after the issuance of the securities, it distributes to the security holders the installments of principal due from the mortgagors and one month's interest on the unpaid principal as of the date of issue. In each of the succeeding months, it follows the same practice of paying the security holders from installments of principal and interest due from the mortgagors 45 days earlier. The reserve arises from the fact that by the date each payment is due the security holders the issuer will have received two mortgage installments—one due 45 days before the security payment and one due 15 days before.[7] Although the Custodial Account contains at its inception interest for one month prior to the time the security holders make their investments, it is offset by the fact that the account receives no interest for the last month of the securities' term because the mortgages have been paid up one month earlier. It is apparent that the entire fund is needed to pay the interest and principal due on the securities, and there is no excess for the issuer other than its one-half percent per annum servicing fee. It must be inferred that an issuer adopting the internal reserve finds the servicing fee an adequate *quid pro quo* for its initial advance.

■ Plaintiff contends that it adopted the internal reserve method of pooling and distribution for 8 of the 15 pools, and that if it had voluntarily sold its interest in servicing such pools to a successor, the consideration it would have received and demanded therefor would have taken into account the value of the internal reserve it advanced. It contends that equity demands therefore that, even in the involuntary transfer, it should likewise be able to withdraw from the Custodial Account the unamortized cost of such reserve. But

---

7. Section 9–2 of the Guide describes the inception of the internal reserve method as follows (emphasis in original):

\* \* \* \* \* \*

Under the *Internal reserve method* of pooling, the unpaid balance of a pool is that balance remaining after all principal payments scheduled for payment *on the first day of the month prior to the date of issue* have been credited. The first payment due securities holders 45 days from the issue date then consists of the principal due as of the date of issue plus prepayments received after the close of business of the day on which the unpaid balance is figured through the initial reporting month, and one month's interest at the securities rate on the unpaid principal as of the date of issue.

\* \* \* \* \* \*

It should be noted that to some issuers the internal reserve method may be preferable as a means of minimizing or avoiding cash shortfalls or insufficiencies of funds for distribution to holders. Under the concurrent dates method it is possible that issuers will need continuous borrowings to cover shortfalls due to delinquencies in payments on pooled loans.

The investor in securities will not be affected by the method of issuance selected by the issuer and will receive the same form of securities regardless of the method chosen.

nothing in the Guaranty Agreement, the applicable regulations or the Mortgage-Backed Securities Guide provides for such a withdrawal. Section 4.12 of the Guaranty Agreement (*see* note 5, *supra*) sets forth all of the permissible withdrawals from such account and it precludes the withdrawal plaintiff now claims. In entering into the Guaranty Agreement, plaintiff must be deemed to have accepted the risk that if it defaulted and GNMA terminated its status, it would be unable to recoup its internal reserve out of the remaining fees.

■ D. *Security Payment Checks Outstanding.* The claim for $9,890, labeled "Security holders checks outstanding", is not explained by plaintiff. Presumably this was the balance available to pay uncashed checks. Defendant contends that since the checks were issued after the extinguishment of plaintiff's interest as servicer, plaintiff should have stopped payment of all outstanding checks by February 1982, when Mr. Harrell executed his affidavit. Defendant infers that the reason these checks were not cashed is that the security holders had already been paid by Baldwin-United or GNMA. Thus, plaintiff has not proven it actually incurred such expenditures, let alone that it was entitled to recoup them out of the Custodial Account.

■ E. *Repayment of Corporate Debt.* Nor has plaintiff shown it was entitled to withdraw from the Custodial Account the $7,451 it paid to the Chemical Bank on February 2, 1982. Mr. Harrell testified in his deposition that the check was to reimburse Chemical Bank for a mistaken payment it had made to STI in December 1980. Thus, the government contends, the payment satisfied a corporate debt of STI to Chemical Bank and is not properly chargeable to the Custodial Account for sums due the security holders. Plaintiff's only response is that "if the funds were deposited into the consolidated [Custodial] account, it should be taken out of the consolidated account." But plaintiff offers no proof and Mr. Harrell testified he did not know to which account the funds were originally deposited. Thus, there is

no basis from which to infer that such funds were in fact deposited in the Custodial Account.

Accordingly, having found that there is no genuine issue of material fact, it is concluded that defendant is entitled to judgment as a matter of law for reimbursement of the $80,316.85 withdrawn by STI from the Custodial Account after June 1981, long after GNMA had extinguished STI's position as servicer of the pooled mortgages and GNMA guaranteed securities.

## V.

■ Defendant's additional claim for $30,132.41 in expenses it incurred in transferring the mortgages serviced by STI to the new servicer is proper because "[s]uch costs would not have been incurred but for [plaintiff's] default in breach of the guaranty agreement." *Consolidated Mtg. & Finance Corp. v. Landrieu*, 493 F.Supp. 1284, 1293 (D.D.C.1980). The issuer is liable for "the costs of transferring the mortgage portfolio" to the new servicer. *Id.* The defendant has, by affidavit, produced proof of damages of $30,132.41 for administrative costs of shipping records, for recording fees, computer printouts, audit costs, and personnel costs of the new servicer that were incurred in the transfer. Plaintiff has not, by affidavit or otherwise, disputed these charges.

There being no genuine issue of fact as to the amount of such damages, summary judgment for $30,132.41 is also granted to defendant.

### Conclusion

The clerk is directed to enter judgment dismissing plaintiff's complaint and awarding to defendant $110,449.26, on its counterclaim.