CONSOLIDATED MORTGAGE AND FI-NANCE CORPORATION, Plaintiff,

v.

Moon LANDRIEU, Secretary of Housing and Urban Development, et al., Defendants.

Civ. A. No. 78–0721.

United States District Court, District of Columbia.

July 23, 1980.

Timothy A. Vanderver, Jr., Joe Robert Reeder, Washington, D. C., for plaintiff.

Mary A. McReynolds, David J. Anderson, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. *INTRODUCTION*

This case is before the Court on defendants' motion for summary judgment and plaintiff's opposition thereto. Because there are no issues of material fact genuinely in dispute, summary judgment is appropriate. For the reasons set forth below, the Court grants summary judgment to defendants with the exception of count five of plaintiff's amended complaint, upon which judgment is granted to plaintiff.

### II. *BACKGROUND*

Plaintiff, Consolidated Mortgage and Finance Corporation ("Consolidated"), brought this action challenging the validity of the Government National Mortgage Association's ("GNMA") termination of Consolidated as an issuer/servicer in the GNMA Mortgage Backed Securities Program. Issues relating to the validity of the termination and subsequent transfer of service rights to International Charter Mortgage Corporation ("Charter") came before the Court on cross motions for partial summary judgment. In a memorandum opinion and order issued September 5, 1979, the Court upheld Consolidated's termination as an issuer/servicer in the GNMA program, as well as the subsequent transfer of service rights to Charter, and granted partial summary judgment to defendants.

The September 5, 1979, decision did not reach certain questions raised in plaintiff's amended complaint, filed September 11, 1978, concerning damages arising out of

Consolidated's termination. In addition, on February 13, 1980, the Court granted defendants leave to file a counterclaim in this action. Thus, the Court must now resolve the issues arising as a result of plaintiff's amended complaint and defendants' counterclaim. With one exception, the Court resolves these issues in favor of defendants.

The Court set forth a substantial amount of background information regarding this action in its September 5, 1979, memorandum opinion ("opinion"). A coherent discussion of the issues now at bar mandates a summary of a portion of that information here.

The Mortgage Backed Securities Program ("MBS Program") administered by GNMA is designed to attract capital into the housing market through an investment instrument known as a mortgage-backed security. 12 U.S.C. § 1721(g) (1976). In connection with this program, GNMA is authorized to issue securities "based on and backed by" a pool of mortgages guaranteed by one of several government agencies [1] and to authorize qualifying private parties to issue such securities. *Id.* GNMA is further authorized to guarantee, with the full faith and credit of the United States, the timely payment of principal and interest falling due on such securities. *Id.*

The MBS Program generally operates as follows: To participate in the Program a financial institution or mortgage servicing company must assemble or acquire a pool of government insured or guaranteed mortgages. GNMA then enters into a standard form Guaranty Agreement ("Agreement") with the issuer [2] under which, *inter alia,* GNMA agrees to guarantee timely payment of principal and interest as required by the terms of the securities, Agreement § 6.01, and the issuer agrees to remit in a timely manner all payments required by the terms of the securities. *Id.* § 4.01. Should the issuer fail to make timely payments as required, the security holder's sole recourse is against GNMA. *Id.* § 7.01. However, GNMA may treat the issuer's failure to make the required payments as an event of default [3] under the Guaranty Agreement (§ 8.01), and this provides GNMA with the option of extinguishing the issuer's interest in the pooled mortgages and becoming the owner of those mortgages "subject only to the unsatisfied rights of the holders of the securities . . .." 12 U.S.C. § 1721(g) (1976); Agreement § 8.05.

On February 7, 1978, GNMA lawfully declared Consolidated in default [4] under the Agreements and began the search for a substitute servicer. Of five potential servicers invited to make offers, only one, Charter, offered to purchase the service rights associated with the mortgage portfolio. On April 13, 1978, GNMA accepted Charter's $126,000 offer and transferred Consolidated's responsibilities to Charter.

The issues raised by plaintiff's amended complaint are whether GNMA is required: (1) to pay over to Consolidated the proceeds of the sale of the service rights associated with the Consolidated portfolio ($126,000); and (2) to refund to Consolidated Certain

---

**1.** Guarantees or insurance from the Federal Housing Administration, the Veterans' Administration, or the Farmers Home Administration are acceptable for GNMA mortgage pools. 12 U.S.C. § 1721(g) (1976); 24 C.F.R. § 390.1 (1979).

**2.** The standard Guaranty Agreement used by GNMA can be found as Appendix 19 of the Mortgage Backed Securities Guide ("MBS Guide") which has been denoted as Exhibit SX 1, filed April 26, 1978. "SX" refers to those documents that the parties stipulated may be admitted in evidence for any purpose. *See* Stipulation of Facts ("SF"), filed August 31, 1978, at 2, n.*. For convenience, the Court refers to the Guaranty Agreement as the "Agreement" rather than as an exhibit. Con-

solidated and GNMA entered into a Guaranty Agreement for each of thirty-seven mortgage pools. These Guaranty Agreements are identical to the standard agreement contained in the MBS Guide at Appendix 19. *See* SF at ¶ 11.

**3.** Under § 8.03 of the Guaranty Agreement, GNMA may also declare other occurrences or *conditions as an event of default.* In fact, GNMA's February 7, 1978, declaration of default rested on § 8.03(1) and (2).

**4.** The February 7, 1978, declaration of default was upheld by the Court in a memorandum opinion and order issued September 5, 1979. Furthermore, the selection of Charter as a substitute servicer was also upheld.

Cash advances made by Consolidated to the portfolio. In their counterclaim against plaintiff, defendants seek (a) a declaration of GNMA's right to be made whole for losses GNMA has incurred that are allegedly attributable to Consolidated's portfolio origination and management practices, and (b) judgment for GNMA in the amount of the losses incurred to date with interest. The facts material to disposition of these issues are not genuinely in dispute. For the reasons set forth below, the Court grants judgment to defendants on the first issue raised in plaintiff's amended complaint. In addition, judgment on defendants' counterclaim is granted to defendants. However, the Court grants judgment to plaintiff Consolidated on the second issue raised in its amended complaint.

### III.  DISCUSSION

A.  *Consolidated Is Not Entitled to the Proceeds of the Sale of the Portfolio.*

In count six of its amended complaint Consolidated seeks recovery of $126,000, which represents the proceeds from the sale of the servicing rights of the portfolio by GNMA to Charter. Plaintiff claims property and contract rights in these proceeds based on a property interest in the mortgage portfolio. Defendants submit that upon the occurrence of default all plaintiff's right, title and interest in the mortgage portfolio, including service rights, terminated and the portfolio became the absolute property of GNMA.

An issuer of mortgage-backed securities assembles a pool of mortgages that will constitute the basis and backing of GNMA-guaranteed securities to be sold over the counter to investors. In assembling the mortgage pool, the issuer may expend funds in the form of loans to mortgagors or the purchase price of existing mortgages. After assembly of the pool, but before issuance of the mortgage-backed securities, the issuer is the sole owner of the mortgage pool and all rights and interest derived therefrom are its alone. Agreement p. 3, ¶ 3. Upon transfer of these rights and interest, the issuer is clearly entitled to some compensation. Defendants do not dispute this right to compensation, but submit that

the issuer is compensated for the transfer of these rights and interest when it sells the mortgage-backed securities to investors. The Court agrees.

■ Under the Guaranty Agreement, the issuer is required to assign to GNMA "all the right, title and interest of the Issuer" in the pool mortgages. Agreement § 3.01. The mortgages are customarily delivered to a designated custodian along with the original notes endorsed in blank, and assignments to GNMA in "recordable form but not recorded." *Id.* § 3.06. Since the assignments remain unrecorded, nominal title remains in the issuer. This assists the issuer in the performance of its duty to service the mortgages. *Id.* § 3.04. Thus, by virtue of the Guaranty Agreement entered into by the issuer and GNMA, GNMA takes all the issuer's right, title and interest in the pooled mortgages. While the issuer may have expended funds in assembling the mortgage pool, it is compensated for this disbursement by the proceeds of the sale of GNMA-guaranteed securities to investors in the market. The mortgage pool itself cannot be the basis of a further claim for compensation by the issuer because the issuer has transferred all its rights in the pool to GNMA and has received compensation for the transfer. Thus, Consolidated must look elsewhere for support of its contention that it is entitled to the proceeds from the sale of the service rights of the mortgage portfolio.

Though Consolidated transferred all its rights and interest in the mortgage pool to GNMA when it entered into the Guaranty Agreement, the Agreement granted Consolidated the right to service the mortgage pool and the securities "backed" by the pool. *Id.* § 4.14. Thus, Consolidated enjoyed the right to future servicing income. *See* MBS Guide, Ch. 5, § 5–1(c). This right, however, is not unlimited. Upon the default of an issuer, GNMA is authorized by statute to provide by contract for the extinguishment of all "right, title and interest" of the issuer in the mortgage portfolio. 12 U.S.C. § 1721(g) (1976). As a result of such extinguishment, the mortgages and all

rights and interest associated with them become the "absolute property" of GNMA. *Id.* Accordingly, the Guaranty Agreements existing between the parties provide that GNMA may, "by letter directed to the Issuer, . . . effect and complete the extinguishment of any . . . right, title or interest of the Issuer" in the mortgage portfolio and further provide that in such event, the mortgages "become the absolute property of GNMA." Agreement § 8.05. Upon the default by Consolidated, GNMA directed a letter to Consolidated on February 7, 1978, formally declaring an event of default. SX 13. This action operated to extinguish all of Consolidated's rights and interest in future servicing income. *See* MBS Guide Ch. 11, ¶ 11–5. As a result, GNMA was free to sell the right to service the portfolio and derive income thereby. Consolidated had no interest in the portfolio at the time of sale due to its default and, therefore, can make no claim on the proceeds of the sale to Charter. Accordingly, judgment on count six of plaintiff's amended complaint shall be entered for defendants.

B. *Consolidated Has the Present Right to Reimbursement of Its Advances to the Custodial Accounts.*

■ In count five of its amended complaint, Consolidated claims the right to be reimbursed for certain funds advanced in connection with the mortgage pools totaling approximately $423,000. Plaintiff made these advances, pursuant to § 4.03 of the Guaranty Agreements, in order to meet cash shortages in the custodial accounts maintained pursuant to § 4.11 of the Agreements. For purposes of the instant motion for summary judgment, GNMA does not contest the amount claimed by Consolidated but contends that Consolidated has no present right to be reimbursed for any of these advances. The Court finds that Consolidated has a present right to claim reimbursement for advances, and it is entitled to reimbursement upon the recovery of the delinquent funds which necessitated the advances.

The resolution of the issue of Consolidated's right to reimbursement of advances made to the custodial accounts requires the interpretation of two sections of the Guaranty Agreements existing between the parties. Under the Agreements, the mechanics for making advances and claiming and receiving reimbursement are controlled by §§ 4.03, 4.12, 7.04 and 7.05. Section 4.03 directs when the advances are to be made; § 4.12 controls, *inter alia*, reimbursement for advances before default by the issuer; § 7.04 provides for the extinguishment, upon default, of all the issuer's right, title and interest in funds then in the custodial accounts, except as provided in § 7.05. The latter section confers upon the issuer the right to claim reimbursement after default. The issue before the Court is whether an issuer in default has an immediate right to reimbursement of advances to the custodial accounts when the particular shortages in the accounts, which necessitated the advances, have been eliminated. The Court concludes that an issuer in default has such a right.

In addressing when an issuer may withdraw funds from the custodial accounts, § 4.12 of the Agreements provides in pertinent part:

[T]he Issuer may make withdrawals against the foregoing Custodial Account under Section 4.11 in order: . . . to reimburse itself or GNMA for any advances made under Section 4.03 above to effect the timely payment of securities issued under this Agreement, provided that such reimbursement, in the case of each advance, shall be only for interest and principal, separately, advanced and paid on such securities, and only from related collections or other recoveries of interest and principal, separately, advanced and paid on such securities, and only from related collections or other recoveries of interest and principal, separately, received from or on account of mortgages pooled under this Agreement, which collections or other recoveries were delayed in payment, and thus made the advance necessary . . . ..

Thus, an issuer not in default under the Agreement may withdraw funds from the custodial accounts to reimburse itself for advances made to the accounts. The only

limitation on this right to reimbursement is that the shortage which necessitated the advance must be eliminated by recovery from the delinquent mortgagor. In contrast, § 7.05 provides for the situation of an issuer who has made advances but also is in default under the Agreement:

> Notwithstanding Section 7.04 above [which provides for extinguishment of the issuer's right, title and interest in the funds in the custodial accounts upon default], the Issuer shall be entitled to *claim* reimbursement for any advances made under Section 4.03 above to effect the timely payment of securities issued under this Agreement, provided that such reimbursement, in the case of each advance, shall be only for interest and principal, separately, advanced and paid on such securities and only from related collections or other recoveries of interest and principal, separately, received from or on account of mortgages pooled under this Agreement, which collections or other recoveries were delayed in payment, and thus made the advance necessary. (Emphasis added).

The contrast in the two provisions is clear: an issuer not in default has an immediate right to reimbursement for advances as the delinquent funds are recovered; an issuer in default has the immediate right to *claim* reimbursement for advances as the delinquent funds are recovered. The Court concludes, however, that the term "claim" in § 7.05 was included in that provision simply in recognition of the fact that a defaulted issuer/servicer no longer controls the custodial accounts and therefore cannot immediately withdraw amounts to reimburse itself upon recovery of the delinquent funds. Thus, a defaulted issuer/servicer may *claim* reimbursement from the substitute servicer for advances made to the custodial accounts and it is *entitled* to reimbursement upon recovery of the delinquent funds which necessitated the advances. Accordingly, because Consolidated has made its "claim" for

reimbursement, it is entitled to reimbursement upon collection of the delinquent funds which necessitated its $423,000 advance. In accordance with the foregoing, and based solely on the Guaranty Agreements existing between the parties, a declaratory judgment on count five of plaintiff's amended complaint shall be entered for plaintiff Consolidated.

C. *Consolidated Is Liable to GNMA for GNMA's Losses Arising Out of the Transfer of the Mortgage Portfolio.*

▮ In their counterclaim, defendants seek a declaration by the Court that Consolidated is liable to GNMA for losses incurred as a result of Consolidated's loan origination and portfolio administration practices. Specifically, GNMA seeks recovery from Consolidated for the following losses: (1) losses incurred by GNMA as a result of Consolidated's failure to ensure that mortgages it placed in the GNMA pools were free of all prior liens; (2) losses incurred by GNMA on account of mortgages two or more months delinquent or in foreclosure at the time of the transfer of the portfolio; (3) losses incurred by GNMA to restore deficits in the tax and insurance custodial accounts; (4) losses incurred on account of unrecouped advances made by GNMA to the portfolio; and (5) costs incurred by GNMA to acquire and transfer the Consolidated portfolio to Charter. For the reasons set forth below, the Court finds Consolidated liable to GNMA for these losses.

An issuer/servicer of GNMA-guaranteed securities assumes a number of responsibilities when it enters into a Guaranty Agreement with GNMA. First, since the issuer/servicer will have assembled the mortgages that back the securities it wishes to issue, the issuer/servicer, in effect, warrants that the mortgages qualify for inclusion in the pool covered by the Guaranty Agreement. In order to qualify for inclusion, each mortgage must be insured by an appropriate agency of the United States.[5]

---

**5.** Section 3.03 of the Guaranty Agreement provides:

> The Issuer hereby covenants and warrants that all the mortgages pooled under this Agreement are validly insured or guaranteed

under the National Housing Act, or title V of the Housing Act of 1949, or the Servicemen's Readjustment Act of 1944, or chapter 37 of title 38, United States Code, and that all such insurance or guaranties continue validly in full force and effect.

To qualify for such insurance, each mortgage must be free of all prior liens or other similar defects. In addition, an issuer/servicer assumes not only the responsibility for risks customarily borne by a mortgage banker, but also assumes responsibility for the costs and risks of loss inherent in the administration of a GNMA-guaranteed mortgage portfolio. *See* MBS Guide, Ch. 4. The MBS Guide specifically provides that these risks include, but are not limited to: "(1) Disallowed foreclosure costs. (2) Loss of interest on foreclosure. (3) Loss of principal on foreclosure. (4) Catastrophic losses not normally covered by hazard and extended [insurance] coverage. (5) Losses arising from condemnation proceedings." *See* MBS Guide, Ch. 4.

An issuer who assumes the responsibility of servicing the portfolio must also meet the requirements imposed by GNMA upon issuers who service the securities on a continuing basis during the life of each pool. These additional requirements include the following:

(1) The issuer/servicer must provide assurance that the servicing of the mortgages will be conducted "in accordance with generally accepted practices of the mortgage banking industry." [6]

(2) The issuer/servicer must correct defective mortgages, or, at GNMA's discretion, repurchase the defective mortgages from the pool at par.

(3) The issuer/servicer must maintain accounts and records "in accordance with sound accounting practices, and in a manner that will permit representatives of GNMA at any time to examine and audit such accounts and records."

MBS Guide, Ch. 11, ¶ 11–3. Thus, upon entering the Guaranty Agreements with GNMA, Consolidated assumed a variety of

risks of loss associated with its administration of the mortgage portfolios.

GNMA submits that losses from Consolidated's loan origination and administration practices should be placed with Consolidated because it was Consolidated's practices which caused the losses and Consolidated assumed the risk of those losses. Indeed, the Court cannot perceive any reason why actual losses, the risk of which were expressly assumed by Consolidated, should be shifted to GNMA upon Consolidated's default under the Guaranty Agreements. Consolidated does not genuinely dispute its liability for these losses, but rather makes a general challenge to GNMA's determination of the amount thereof. The Court finds Consolidated's challenge unpersuasive and insufficient to preclude summary judgment on defendants' counterclaim in favor of GNMA.

In order to determine the precise amount of the losses incurred by GNMA in connection with the transfer of the Consolidated portfolio, GNMA, through counsel, engaged the accounting firm of Price Waterhouse & Co. to review certain books and records of Consolidated, Charter and GNMA. Price Waterhouse has ascertained that as of December 31, 1979, GNMA incurred known losses attributable to Consolidated's mortgage banking practices in the total amount of $582,794.83.[7]

■ Consolidated claims that defendants have failed to show that the documents underlying the Price Waterhouse Study are accurate, complete and "valid." Therefore, plaintiff argues, the Court is precluded from relying on the Study and summary judgment in defendants' favor on the counterclaim is inappropriate. However, it is not defendants' burden to prove the accuracy of its expert's Study, rather, it is Consoli-

---

*See also,* n.1, *supra.*

**6.** This assurance must be evidenced by a duly executed HUD Form 1707, Servicing Agreement. *See* MBS Guide, Ch. 11, ¶ 11–3 and Appendix 8. Significantly, this agreement, which Consolidated executed for each pool it assembled, provides that the issuer/servicer will service the pool mortgages "in accordance with the requirements set forth in the GNMA

Mortgage-Backed Securities Guide." *Id.,* Appendix 8, p. 3.

**7.** Price Waterhouse & Co., *Accounting Study of Disbursements as of December 31, 1979 by the Government National Mortgage Association in Connection with the Transfer of the Consolidated Mortgage and Finance Corporation Portfolio,* dated January 11, 1980 ("Price Waterhouse Study"), filed January 15, 1980, at 3.

dated's burden to show inaccuracy of the underlying documents or Study. Consolidated has failed to carry this burden. Consolidated does not challenge a single determination, finding or conclusion of the Price Waterhouse Study; rather, it alludes generally to the possibility of inaccuracy. This is plainly insufficient to show that the Study is unreliable and unworthy of the Court's consideration. Without a more *specific* challenge to the accuracy of the Study or the documents upon which it is based, Consolidated's argument must fail. *Coleman v. Darden*, 595 F.2d 533 (10th Cir.), *cert. denied*, 444 U.S. 927, 62 L.Ed.2d 184, 100 S.Ct. 267 (1979); *see also Golden Oil Co. v. Exxon Co.*, 543 F.2d 548 (5th Cir. 1976). Accordingly, the Court will not disregard the Price Waterhouse Study.

1. *Consolidated's Prior Lien Liability.*

Upon execution of the Guaranty Agreement for each mortgage pool, Consolidated warranted that each and every mortgage qualified for inclusion in the pool. Agreement § 3.03.[8] Because each mortgage must be free of all prior liens before it can be insured, and since each mortgage must be insured before it qualifies for inclusion in a pool, Consolidated breached its warranty with respect to each mortgage which has a prior lien and/or lacks insurance. The Court finds that GNMA is entitled to an award of damages for losses caused by Consolidated's breach under § 3.03 of the Agreements.

Upon transfer of the Consolidated portfolio to it, Charter began auditing mortgages then in foreclosure and placing delinquent mortgages in foreclosure. In the process, Charter discovered a high number of mortgages which appeared to have prior liens. This discovery led to a decision to conduct a title search for each mortgage in eleven of the thirty-seven pools.[9] Charter also found, through notification by mortgagors or title searches performed in conjunction with foreclosure proceedings, a number of additional mortgages with uncancelled or unpaid prior liens. In all, Charter identified 167 mortgages that had uncancelled prior liens, 8 of which comprised unpaid liens and 159 of which comprised paid, but uncanceled liens.[10] As of December 31, 1979, the total loss to GNMA attributable to prior lien problems is $162,600.31.[11]

When Consolidated entered into the Guaranty Agreement for each of thirty-seven pools, it warranted that each mortgage qualified for inclusion in the pool; specifically, Consolidated warranted that each mortgage was insured by an appropriate federal agency.[12] In the course of auditing the problem mortgages discussed above, Charter discovered eighty-three loans in the Consolidated portfolio that lacked the required insurance. While it is uncertain what the ultimate total loss incurred by GNMA will be as a result of this deficiency, GNMA's losses incurred as of December 31, 1979, are $9,385.80.[13]

Consolidated's sole defense to prior-lien liability is that Charter "inherited" a cause of action against Advisors Mortgage ("Advisors"), a company that Consolidated claims was responsible for failing to discharge the prior liens, or Banco Credito, the bank that "sanctioned" the financing arrangement between Consolidated and Advisors. The Court finds Consolidated's argument patently without merit. It was Consolidated, not Advisors or Banco Credito, which entered the Guaranty Agreements with GNMA and warranted that the mortgages qualified for inclusion in the pools. Consolidated, not third parties, must answer for its breach and the losses caused thereby. Accordingly, the Court finds and declares Consolidated liable to GNMA for (1) $162,600.21 in losses incurred by GNMA as a result of prior liens, and (2) $9,385.80 in losses incurred by GNMA to date resulting from lack of required insurance.

8. *See* n.5, *supra.*

9. Price Waterhouse Study at 6.

10. *Id.* at 7.

11. *Id.* An itemization of this loss is set forth on p. 7 of the Price Waterhouse Study.

12. *See* n.5, *supra.*

13. Price Waterhouse Study at 12.

2. *Consolidated's Liability for Mortgages Two or More Months Delinquent or in Foreclosure At the Time of Transfer.*

As noted, upon execution of the Guaranty Agreements, Consolidated assumed the risks inherent in participation in the GNMA program. *See* MBS Guide, Ch. 4. Among the risks assumed by Consolidated was the risk of losses arising from foreclosure and delinquencies. Accordingly, the Court finds and declares Consolidated liable for losses incurred by GNMA resulting from mortgages in foreclosure or two or more months delinquent at the time of transfer of the Consolidated portfolio to Charter. As of December 31, 1979, the known losses incurred by GNMA and attributable to Consolidated in connection with mortgages in this status are $153,162.81.[14] Some of this loss may be recovered by GNMA upon the sale of properties now held by GNMA.[15] In that event, GNMA must inform Consolidated of the extent of recovery to enable Consolidated to lodge a claim for reimbursement. Nevertheless, GNMA is entitled to hold Consolidated liable for the $153,162.81 loss sustained to date. It cannot be genuinely disputed that but for Consolidated's default and the subsequent transfer of the portfolio to Charter, Consolidated would have assumed this loss. The Court can perceive of no reason Consolidated's default should operate to transfer its losses to GNMA. These losses are, and must remain, attributable to Consolidated.

3. *Consolidated is Liable for Losses Incurred by GNMA to Restore Deficits in the Tax and Insurance Custodial Accounts.*

Each monthly payment by a mortgagor of a mortgage in a GNMA pool, comprises 1) principal repayment, 2) interest, 3) approximately one-twelfth of the annual property taxes due on the mortgaged property, and 4) approximately one-twelfth of the annual premium on casualty insurance for the mortgaged property. The Guaranty Agreements provide that all collections of principal, interest, taxes and insurance premiums shall be deposited in custodial accounts maintained solely for that purpose. Agreement, §§ 4.11, 4.13. The Agreements also provide that withdrawals from the custodial accounts shall be made only for specified purposes such as payment of investors, taxes or insurance premiums. *Id.*

Upon the transfer of the Consolidated portfolio, Charter assumed control of Consolidated's custodial accounts. In reviewing bank records of these accounts, Charter determined a deficiency of $44,652.76 in Consolidated's tax and insurance custodial accounts.[16] Charter was subsequently reimbursed by GNMA for this deficiency.[17] While Consolidated claims that it did not withdraw any funds from these accounts improperly, it does not adequately explain the $44,652.76 deficiency. Because Consolidated would be liable for such a deficiency absent the transfer of the accounts to Charter, the Court finds and declares Consolidated liable to GNMA for the missing funds.

4. *Consolidated is Liable for Unrecouped Advances Made by GNMA to the Portfolio.*

The Guaranty Agreements provide that where collections do not equal the total payments currently due investors, "the Issuer shall prepare to make and shall make advances from its own funds." Agreement, § 4.03. Moreover, the MBS Guide states that "[a]ny losses of principal and/or interest which, by the terms of the Guaranty Agreement, should have been borne by the defaulting issuer will be assessed to, and paid by the defaulting issuer at the time such losses become known." MBS Guide, Ch. 11, ¶ 11–5.

Upon the declaration of default by GNMA, Consolidated was unable to meet the next payment due investors. Accordingly, on April 15, 1978, GNMA advanced $484,548.62 to the Consolidated portfolio for the purpose of making the payment to investors.[18] This amount represents the defi-

14. *Id.* at 6.

15. *Id.* at 5–6.

16. *Id.* at 9.

17. *Id.* at 10.

18. *Id.* at 11.

ciency in collections of principal and interest by Consolidated as of that date.[19] At present, GNMA has recovered $301,557.78 of this advance.[20] GNMA now seeks to hold Consolidated liable for the $182,990.84 in unrecouped advances. Under the terms of the Guaranty Agreements existing between the parties, Consolidated is liable for unrecouped advances. The default by Consolidated simply has no effect on this liability. Accordingly, the Court finds and declares Consolidated liable to GNMA in the amount of $182,990.84 in unrecouped advances.

### 5. Consolidated is Liable to GNMA for GNMA's Costs In Acquiring and Transferring the Portfolio.

Charter incurred costs of $30,002.31 in connection with the acquisition and conversion of the Consolidated portfolio.[21] These costs include such items as moving expenses incurred in physically transferring the portfolio records, establishing satisfactory servicing records to conform with Charter's servicing practices, inspection of mortgage properties, the costs of a mailing to all mortgagors to confirm each loan balance and to inform each mortgagor of the new servicer's identity and procedures for remitting payments, and costs of notifying the FHA of the change of mortgagee. GNMA has reimbursed Charter for these costs.[22] Such costs would not have been incurred but for Consolidated's default. Accordingly, the Court finds and declares consolidated liable to GNMA for $30,002.31 representing the costs of transferring the mortgage portfolio from Consolidated to Charter.

### D. Consolidated's Argument that GNMA Failed to Mitigate Consolidated's Losses Is Not Properly Before the Court.

Consolidated unpersuasively argues that GNMA has failed to discharge its good faith obligation to mitigate Consolidated's losses. However, the Court finds no convincing indication of a failure by GNMA to mitigate the losses for which it now seeks recovery from Consolidated. Moreover, Consolidated's assertions concerning mitigation are not properly before the Court. Mitigation is an affirmative defense that is required by Rule 8(c) of the Federal Rules of Civil Procedure to be "set forth affirmatively" by Consolidated in its responsive pleading. See 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1273 (1969). Defendants' claims for damages against Consolidated are set forth in their counterclaim, filed January 15, 1980.[23] Consolidated's responsive pleading, filed February 22, 1980, sets forth no affirmative defenses whatsoever. Failure to plead an affirmative defense results in a waiver of that defense and its exclusion from the case. *Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, 513 F.2d 407, 419 n.92 (D.C.Cir.1975); see also 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1278 (1969 & Supp.1979) and cases collected therein. Accordingly, the defense of failure to mitigate damages was waived by Consolidated and is not properly before the Court.

### IV. CONCLUSION

In accordance with the foregoing, the Court finds and declares Consolidated liable

---

**19.** Consolidated correctly states that there was $329,477.12 available in the principal and interest custodial accounts to make the April 15, 1978, payments to investors. However, due to the exigencies created by Consolidated's default on April 10, 1978, GNMA advanced its own funds to make the payments to investors. This procedure obviated any delay in making the payments. Subsequent to the April 15 payments, the funds in the various principal and interest custodial accounts were transferred to Charter for use in making the necessary payments to investors in later months. Thus, the

$182,990.84 unrecouped advances for which GNMA now seeks recovery from Consolidated represents a net deficit.

**20.** Price Waterhouse Study at 11.

**21.** For an itemization of these costs, see Price Waterhouse Study at 10.

**22.** *Id.*

**23.** On February 13, 1980, the Court granted defendants leave to file their counterclaim.

to GNMA in the amount of $582,794.83. The Court also finds and declares that, upon recovery of the delinquent funds which necessitated the particular advances, Consolidated has the right to reimbursement of advances made to the custodial accounts. Judgment shall be entered accordingly and this case shall be dismissed. An order in accordance with the foregoing shall be issued of even date herewith.

## ORDER

Upon consideration of the entire record herein and in accordance with the Memorandum Opinion issued of even date herewith, it is, by the Court, this 23 day of July, 1980,

ORDERED, that defendants' motion for summary judgment be, and the same hereby is, granted in part and denied in part in accordance with the terms of the Memorandum Opinion issued of even date herewith; and it is

FURTHER ORDERED, that judgment on count five of plaintiff's amended complaint be, and the same hereby is, entered for plaintiff in accordance with the terms of the Memorandum Opinion issued of even date herewith; and it is

FURTHER ORDERED, that judgment in the amount of Five Hundred Eighty-two Thousand Seven Hundred Ninety-four Dollars and Eighty-three Cents ($582,794.83), with interest, be, and the same hereby is, entered for defendants; and it is

FURTHER ORDERED, that this case be, and the same hereby is, dismissed, each party to bear its own costs.