**REGENCY COMMUNICATIONS,
INC., et al., Plaintiffs,**

v.

**CLEARTEL COMMUNICATIONS,
INC., et al., Defendants.**

**No. CIV.A. 98–1160(RCL).**

United States District Court,
District of Columbia.

Feb. 18, 2004.

See also 212 F.Supp.2d 1.

Edward O. DeLaney, Barnes & Thornburg, Indianapolis, IN, Richard Henry Streeter, Barnes & Thornburg, Washington, DC, for Plaintiffs/Intervenor Plaintiff.

David McCrory Estabrook, Gordon & Estabook, RLLP, Fairfax, VA, John Joseph Brennan, III, Jackson & Campbell, Vernon Webster Johnson, III, Jackson & Campbell, P.C., Washington, DC, Barton R. Groh, pro se, Potomac, MD, Stephen Roberts, pro se, Pompano Beach, FL, for Defendant/Counter Claimant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court after the completion of a bench trial and the submission of proposed findings of fact and conclusions of law by the parties. The

purpose of the trial was to resolve the remaining outstanding issues that barred final resolution of the case. The Court resolved the bulk of the legal issues in two prior opinions. In July 2001 the Court issued an opinion resolving the parties' cross motions for summary judgment. *Regency Communications, Inc. v. Cleartel Communications, Inc.*, 160 F.Supp.2d 36 (D.D.C.2001) (*"Regency I"*). In July 2002 the Court denied defendants' motion for reconsideration. *Regency Communications, Inc., v. Cleartel Communications, Inc.*, 212 F.Supp.2d 1 (D.D.C.2002) (*"Regency II"*). Upon consideration of the evidence presented at trial, the parties' proposed findings of fact and conclusions of law, and the applicable law in this case: the Court finds plaintiffs met their burden of proof on damages for breach of contract against Cleartel and therefore shall award Regency damages in the amount of $25,580.27 against Cleartel and shall award Actel damages in the amount of $23,147.22 against Cleartel. Furthermore, the Court finds for the plaintiffs on their claims under 18 U.S.C. §§ 1962(c) and 1962(d) against defendants Auger and Groh and shall award treble damages on those claims pursuant to 18 U.S.C. § 1964(c). Therefore the Court shall award Regency the amount of $76,740.81 against defendants Auger and Groh and shall award Actel the amount of $69,441.67 against defendants Auger and Groh. Plaintiffs are further permitted to submit a bill of costs and fees in accordance with 18 U.S.C. 1964(c).

### BACKGROUND

Plaintiffs Actel and Regency are companies that owned large numbers of pay telephones in the state of New Jersey and are generally referred to as Customer Owned Coin Operated Telephone companies or COCOTs. Typically, a COCOT negotiates a contract with a location owner such as a convenience store to place a payphone at the location owner's premises and will pay the location owner a share of the revenues earned from the payphone. In order to provide telephone services such as long distance and operator assistance to their pay phones and to obtain billing and collection services for themselves, a COCOT contracts with an Operator Service Provider or OSP such as defendant Cleartel.

In the present case, plaintiffs Actel and Regency respectively entered into contractual relationships with defendant Cleartel to provide operator services. Actel signed three separate contracts with Cleartel, dated 1990, 1991, and 1998. (Pls.' Ex. 1, 2, and 3). Regency entered into a single contract with Cleartel in 1996. (Pls.' Ex. 4). As the conduct at issue in this suit began in 1995, only Actel's 1990 contract is not at issue.

The most salient provisions of each contract are those that define and arrange the revenue sharing between the plaintiff and defendant. They are most easily understood from the perspective of a typical payphone call. An end user makes a call from one of Actel's pay phones and opts to bill the charges for that call to his home phone. The end user pays three types of fees for the call all of which are billed and collected by Cleartel and then distributed according to the terms of the contract with plaintiffs. First, the end user pays a location surcharge—a flat fee for the use of the phone—that is paid 100% to the plaintiffs. Second, the end user pays an operator handling charge—a flat fee determined by the type of assistance the operator renders for the end user, e.g. collect calls, third party calls—that is divided between Actel and Cleartel. Third, the end user pays a per-minute charge that is likewise divided between Actel and Cleartel. The operator charges and the per-minute charges are split according to a contractu-

ally established percentage. For example, the 1998 Regency contract (Pls.' Ex. 4) provides a "Schedule A" that sets forth the varying commission percentages for different types of calls, e.g. intrastate, interstate. After a call is completed, Cleartel, through other companies, sends a bill to the end user for the sum of the charges.

Plaintiffs initiated this suit in 1998 after discovering that Cleartel was not reporting all of the charges that it assessed end users for a phone call. Furthermore, Cleartel was not paying plaintiffs any percentage of those hidden charges. Plaintiffs' discovery occurred purely by accident. After making test phone calls from one of the company's payphones, Regency's owner discovered that the amount that appeared on his monthly phone bill, which was administered by the local phone company, was greater than the amount of the charge for that exact call that Cleartel reported as billing the end user on the monthly statement it sent to Regency. Only by comparing this discrepancy did Actel and Regency ever discover that Cleartel was assessing additional charges and not reporting those charges to plaintiffs.

In July 2001, the Court issued an opinion resolving cross motions for summary judgment, *Regency I*.[1] In *Regency I* the Court first observed that "Cleartel readily admits that (1) the commission paid to Regency and Actel was based on amounts less than actually charged to the end user, and (2) it charged the end user more than it reported to Regency and Actel." 160

F.Supp.2d at 40. The Court found such actions to be violations of the contracts between defendant Cleartel and plaintiffs Regency and Actel and granted summary judgment for plaintiffs Regency and Actel on their breach of contract claim against Cleartel. Cleartel's failure to pay commissions to plaintiffs based on the amounts actually charged to end users violated section 2.1 of the contracts.[2] *Id.* Similarly, Cleartel's failure to report the actual amount it was charging end users in its monthly statements to plaintiffs violated section 2.4 of the contract.[3] *Id.* The Court granted summary judgment for the defendants on Mark Parrella's breach of contract claim and on Regency and Actel's breach of contract claims against the individual defendants.

The *Regency I* opinion also considered plaintiffs' claim that defendants violated section 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1962(d), in light of defendant's motion for summary judgment on that claim and made the following findings: (1) "enough evidence exists for a reasonable jury to find that the defendants utilized the mail to deceive the plaintiffs," 160 F.Supp.2d at 44; (2) "Regency and Actel were the intended targets of the alleged RICO violations," *Id.* at 45; (3) "Cleartel is alleged to be an 'enterprise,'" *Id.*; (4) plaintiffs' allegations that defendants "deceived them by withholding information and monies multiple times over a several year period" represents an "adequately alleged [ ] 'pattern

---

1. *Regency I* contains a full description of the parties' relationships, contracts, and the allegations in the complaint. Such facts will only be referenced here to the extent necessary to support this opinion.

2. Section 2.1 provided that Cleartel was obligated to pay plaintiffs "a commission of all call charges ... captured, billed, and collect-

ed by Cleartel." (Pls.' Ex. 2 at 1, Pls.' Ex. 3 at 1, and Pls.' Ex. 4 at 1).

3. Section 2.4 obligated Cleartel to provide on a monthly basis "a summary of gross long distance calls, minutes, and charges by originating phone number." (Pls.' Ex. 2 at 2, Pls.' Ex. 3 at 2, and Pls.' Ex. 4 at 2).

of 'racketeering activity,'" *Id.* at 46; (5) because the "predicate acts all stemmed from identical long distance service contracts between the parties ... the predicate acts are clearly 'related' and constitute a 'closed period of repeated conduct,'" *Id.*; (6) plaintiffs sufficiently pleaded conspiracy and introduced evidence in their motion for summary judgment to "enable a jury to reasonably infer that the individually-named defendants conspired." *Id.*

*Regency I* further granted summary judgment for defendants on plaintiffs' fraud claims, but held that the dismissal of the fraud claims did not affect the viability of plaintiffs' RICO claims. *Id.* at 41, 43. The Court also granted summary judgment for plaintiffs on defendants' counterclaims *Id.* at 46.

After *Regency I* three of the plaintiffs' claims remained for trial. First, because plaintiffs prevailed on liability on the breach of contract claim brought by Regency and Actel against Cleartel, the sole remaining issue on the breach of contract claim is the issue of damages. Second, having survived summary judgment, plaintiffs must present factual evidence to support their two RICO claims, 18 U.S.C. §§ 1962(c), and 1962(d). In August 2003, the Court held a bench trial to allow the parties to present evidence on these issues.

### BREACH OF CONTRACT CLAIM

A.  The Breach of Contract

There are three contracts at issue in this case. Plaintiff Actel and defendant Cleartel entered into a contract in 1991, (Pls.' Ex. 2), covering the time period from 1991 to 1998, and a second contract in February 1998, (Pls.' Ex. 3), which lasted until terminated in November 1998. Plaintiff Regency entered into one contract with Cleartel in April 1996. (Pls.' Ex. 4). These three contracts will be referred to collectively as "the contracts" with differences noted as required.

In 1995 Cleartel and its key employees, including defendants Auger and Groh, observed that their business was suffering decreased profitability. The main driver appeared to be an increase in uncollected charges. Cleartel would process the call data from plaintiffs' payphones and pay plaintiffs on a thirty-day cycle as required by section 2.4 of the contracts. (Pls.' Ex. 2 at 1; Pls.' Ex. 3 at 1; Pls.' Ex. 4 at 1). Defendants submitted the call charge data to third parties who would in turn bill the end users and collect payments. As the payments from end users were collected the third parties would remit payment to Cleartel. In 1995 defendants observed that the amounts collected were decreasing; in other words, their uncollected charges, or uncollectibles were increasing. Until that time the only means of protection against the risk and incidence of uncollected charges was the percentage of COCOT commissions that were held back to offset uncollectibles pursuant to section 2.3 of the contracts.

Defendants' solution was to implement a direct charge against end users and keep 100% of the revenue from this charge for themselves. This charge was in addition to the standard operator handling charges, per-minute charges, and location surcharges that were already assessed against an end user who made a phone call. Defendants labeled this charge the Uncollectible Cost Recovery Surcharge ("UCRS"). Defendants neither paid a commission nor reported the existence of the UCRS to plaintiffs. In *Regency I* the Court found that defendant Cleartel breached its contracts with plaintiff Regency and Actel in failing to report or pay commissions on the UCRS. *Regency I*, 160 F.Supp.2d at 40.

## B. Plaintiffs' Damages

■ The most appropriate measure of plaintiffs' damages for breach of contract is expectancy damages. *See* Restatement of the Law (Second) Contracts § 347 (1981). According to the contracts, plaintiffs expected to receive compensation from all of the charges that were assessed a pay phone end user. According to section 2.2 of the contracts, plaintiffs were to receive 100% of the location surcharge. (Pls.' Ex. 2 at 1; Pls.' Ex. 3 at 1; Pls.' Ex. 4 at 1). Section 2.1 of the contracts provided that plaintiffs would receive a fixed percent commission of all other charges that Cleartel assessed. (*Id.*). Each contract set a different commission percentage. Section 2.1 stated that the "commission plan is based upon Cleartel's standard COCOT rates." Cleartel's rates are in turn set forth in its tariff. (Defs.' Ex. 9). The tariff shows two types of charges, an operator handling charge and a per-minute rate. The contracts did not specify what the actual operator handling charges and per-minute charges would be and those amounts could and did change whenever Cleartel modified its tariff.

Defendants claim that they were entitled under the contract to levy the UCRS charge and to keep 100% of the money collected from it. (Tr. at 319–21). This statement is contradicted by the fact that defendants implemented the UCRS by increasing the amount of their operator handling charges on their tariff. (Defs.' Ex. 9, 10; Tr. at 370–71). Defendants do not dispute and in fact admit plaintiffs had a right to receive commission on any amount charged as part of Cleartel's base rate, which included operator handling charges. (Tr. at 310, 320–21). Thus defendants acknowledged that plaintiffs' total expected compensation from the contract should have included commission on the amount charged end users under the name UCRS.

(Tr. at 366–69). The Court concludes that plaintiffs' expectation damages includes their contractual commission percentage of all charges assessed by defendants, specifically including all charges labeled by defendants as a UCRS.

The Court rejects plaintiffs' argument that their expectancy damages are the entire amount of the UCRS rather than their contractually set commission percentage. Plaintiffs' argument hinges on defining the UCRS as a location surcharge, which under the contract is paid 100% to plaintiffs. (Tr. at 51–53). Plaintiffs assert that because the UCRS was a flat fee levied against each end user that it is similar to a location surcharge in form and therefore should be distributed like a location surcharge. What plaintiffs ignore is the fact that the location surcharge is also set forth as a specific dollar amount in the contract and plaintiffs admit that they received the correct contractually set location surcharge on each call made. (Tr. at 51–53).

## C. Defendants' Setoff

■ Defendants attempt to negate their concession of plaintiffs' right to commissions on the UCRS with a setoff for the actual uncollectibles experienced by defendants. In support of this theory, defendants presented a damages model that charges back actual uncollectibles to the plaintiffs and sets off that amount against any unpaid commission owed plaintiffs. (*See* Defs.' Ex. 7, 8; Tr. at 366–70). Defendants' argument is that they have a contractual right to perform a "true-up." Defendants argue that any additional compensation owed plaintiffs should be offset by the actual uncollectibles experienced by Cleartel over the relevant period.

■ ▪ Defendants' attempt to offset plaintiffs' damages is flawed for reasons of law and fact. First, defendants are either trying to now plead a compulsory counter-

claim or trying to assert a setoff as an affirmative defense. Setoff is an affirmative defense under Federal Rule of Civil Procedure 8(c). *See* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1271 (1990); *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1245 (5th Cir.1994). Defendants' "failure to plead an affirmative defense results in a waiver of that defense and its exclusion from the case." *Consolidated Mortgage and Finance Corp. v. Landrieu*, 493 F.Supp. 1284, 1293 (D.D.C. 1980); *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1278 (1990).

In the alternative, as defendants' claim "arises out of the transaction or occurrence that is the subject of the opposing party's claim" it is a compulsory counterclaim under Federal Rule of Civil Procedure 13. Defendants filed their answer and counterclaim in response to plaintiffs' second amended complaint on April 12, 1999. Therein, defendants set forth both affirmative defenses and counterclaims none of which regarded any claim for monies owed to defendants by plaintiffs for any uncollected charges. Defendants failed to timely plead an affirmative defense or file a counterclaim and their claim is therefore waived.

■ Even if the Court found no legal impediment to defendants' attempted setoff the Court finds the claim fails for lack of evidence. Defendants repeatedly admitted that they lacked the technological ability to attribute any particular uncollected charges to either a particular phone or to a particular COCOT, (Tr. at 274, 327, 366). This meant that the amount of actual uncollectibles used in defendants' damage model is not "actual" in the sense that it represents uncollected charges from phones owned by plaintiffs. Rather defendants extrapolated those numbers using state wide uncollectible charge data thus creating an estimate of uncollectibles. (Tr. at 316, 367). In addition, the Court finds that the evidence defendants presented was highly speculative and did not constitute sufficient proof of defendants' uncollected charges and is therefore incapable of supporting a determination of the amount defendants might be entitled to setoff against plaintiffs' damages. Finally, even if the Court were to find that defendants presented sufficient evidence to support their setoff claim, defendants' own model shows that such a setoff increases plaintiffs' damages rather than decreases them because defendants overcharged plaintiffs for uncollectibles.

Defendants' damages model, (Defs.' Ex. 7, 8), is flawed because it gives to defendants as profit their portion of the UCRS and charges "actual" uncollectibles against plaintiffs' portion of the UCRS. Given defendants' oft stated rationale for charging the UCRS as a means to recoup actual uncollectibles directly from the end user and not from plaintiffs, defendants should devote their share of this surcharge to offsetting actual uncollectibles, not plaintiffs. (Tr. at 319–21). Defendant Groh admitted as much when he stated that if he had to pay Actel their 35% commission on the UCRS "[Cleartel] would have only received 65 cents, and for whatever number I felt like I needed to cover my uncollectibles, I would have had to raise the rate by a third above what I actually needed" (Tr. at 320). Yet even when plaintiffs' share of the UCRS is removed and defendant's share of the UCRS is added to the percentage holdback in the contract, the total of these numbers exceeds in every case the actual amount of uncollectibles. Thus, defendants will have collected excess funds beyond their actual uncollectibles even if they pay plaintiffs their percentage

commission on the UCRS.[4]

D. The Damage Calculation

Defendant Cleartel began to assess the UCRS in approximately August of 1995. (Tr. at 382). Defendants' damages model notes September 1995 as the first month where defendants failed to pay compensation to plaintiffs for the UCRS. (Defs.' Ex. 7, 8).

After evaluating all the evidence presented on damages the Court finds as follows: 1) Defendants began assessing the UCRS at some point in the month of August 1995 making September 1995 the first month for which damages can be calculated (Tr. at 382; Defs.' Ex. 7, 8); 2) The amount of the UCRS was $0.78 per call for both Regency and Actel; 3) Regency and Actel were entitled to receive their contractual commission percentage on the UCRS; 4) Cleartel's actual uncollectibles were too speculative to support any amount of offset to those commissions even assuming no legal hurdles; 5) Even if Cleartel's proof were accurate, Cleartel should have used the portion of the UCRS that it kept after paying commissions to

cover its uncollectibles, entitling plaintiffs to receive their full commission on all charges.

Based on the foregoing, Regency's damages are as follows:

| | |
|---|---|
| Total Calls made April 1996 to Feb. 1997 | 67,899 |
| UCRS per call | 50.78 |
| Total UCRS | $52,961.22 |
| Regency's Commission % | 52.50% |
| Amount of Commissions owed Regency | $27,804.64 |
| 8% uncollectible holdback | $ 2,224.37 |
| Net Amount owed Regency | $25,580.27 [5] |

Actel's damages under its 1991 contract are as follows:

| | |
|---|---|
| Total Calls made Sep. 1995 to Jan. 1998 | 61,591 |
| UCRS per call | $ 0.78 |
| Total UCRS | $48,040.98 |
| Actel's Commission % | 35% |
| Amount of Commissions owed Actel | $16,814.34 |
| 10% uncollectible holdback | $ 1,681.43 |
| Net Amount owed Actel | $15,132.91 |

Actel's damages under its 1998 contract are as follows:

| | |
|---|---|
| Total Calls made Feb. 1998 to Nov. 1998 | 26,591 |
| UCRS per call | $ 0.78 |
| Total UCRS | $20,740.98 |
| Actel's Commission % | 42% |
| Amount of Commissions owed Actel | $ 8,711.21 |
| 8% uncollectible holdback | $ 696.90 |
| Net Amount owed Actel | $ 8,014.31 [6] |

Actel's total contract damages are $23,147.22 ($15,132.91 + $8,014.31).

4. Here is an example using the defendants' own numbers from Defendants' Exhibit 7 (not the actual numbers the Court uses in its damages calculation). The calculation of Actel's damages for the period of September 1995 to December 1997 is as follows: Automatic contractual holdback from commissions totals $24,224. Cleartel's share of the UCRS after paying Actel its commission on the UCRS totals $30,524. The total of these two is $57,748 compared to actual uncollectibles of $38,306. Thus Cleartel collected an extra $16,442 from its UCRS above what it needed to offset its actual uncollected charges. Thus Cleartel should pay Actel its share of the UCRS charges totaling $16,436 for this period. By comparison, under Cleartel's model, Cleartel would use Actel's commissions from the UCRS plus the automatic holdback to offset the actual uncollectibles, then give Actel the remaining $2,354 and Cleartel would

keep for itself as additional revenue its share of the UCRS. Each of the other damage models produces a similar result.

5. Plaintiffs' Exhibit 6 calculates damages based on only 66,673 calls but the Court finds that defendants' data on the number of calls is more accurate and so uses defendants' number, 67,899. The Court also uses defendants' commission data, which represents the average of the four commission percentages due Regency under Schedule A of its contract. (Tr. at 370; Pls.' Ex. 4 at 7).

6. The number of calls used is the amount of reported on Plaintiffs' Exhibit 5 for the dates shown. The commission percent for the 1995–1998 time period is 35%. (Tr. at 368). The commission for February to November 1998 is the amount stated on Schedule A to the relevant contract. (Pls.' Ex. 3 at 8).

## RICO CLAIMS

### A. Liability

RICO, 18 U.S.C. §§ 1961–1968 (2003), provides a civil remedy for any person who is injured in his business or property by reason of conduct which amounts to racketeering activity. 18 U.S.C. § 1964(c). Plaintiffs claim defendants' conduct violated § 1962(c) and § 1962(d).

> A civil RICO plaintiff claiming a violation of § 1962(c) must allege and prove (1) an injury to his business or property by reason of the violation; (2) the existence of an enterprise; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the enterprise's affairs; and (5) that the participation was through a pattern of racketeering activity.

*Danielsen v. Burnside–Ott Aviation Training Center, Inc.,* 941 F.2d 1220, 1231 (D.C.Cir.1991) (citing cases).

In *Regency I,* the Court found as a matter of law that plaintiffs sufficiently alleged the elements of a civil RICO claim under 1962(c), *Regency I,* 160 F.Supp.2d at 44–46, and that "Regency and Actel were the intended targets of the alleged RICO violations." *Id.* at 46.

■ The Court finds that the damages to both Regency and Actel documented above constituted an injury to each of their respective businesses and that such injury occurred as a proximate result of defendants' violations of RICO in satisfaction of the first element above. By deceiving plaintiffs about the amount of money owed them, defendants were able to retain significant additional revenues that would otherwise have been paid to plaintiffs.

■ According to 18 U.S.C. § 1961(4), a RICO enterprise includes "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Cleartel was a corporation operating out of the District of Columbia that conducted business with parties in multiple other states, including New Jersey, and was otherwise engaged in interstate commerce.

■ Participation in the conduct of the enterprises' affairs requires "participation in the operation or management of the enterprise itself." *Danielsen,* 941 F.2d at 1231 (citing *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 952–6 (D.C.Cir.1990) (en banc)). Defendants Auger and Groh were both employed by and associated with Cleartel. Defendant Auger participated in founding the company (Tr. at 225) and served as its President at all times relevant to this action (Pls.' Ex: 17 at 2–6). Defendant Groh served as Director of Finance and later Chief Financial Officer. (Tr. at 265–66). Defendants Auger and Groh both participated in the operation and management of Cleartel. Defendant Auger testified that the "implementation of the UCRS" was his decision. (Tr. at 249). Defendant Groh played a role in the implementation of the scheme. He participated in the sales meeting creating the UCRS (Tr. at 318), calculated the amount of the UCRS (Tr. at 319), and then as part of the implementation "coordinated with [Cleartel's] IT Department to create the programming in our billing system to add this additional charge to the bills." (Tr. at 321–322). Furthermore, even though Mr. Groh retained a sales representative relationship with Actel (Tr. at 201) he never informed Actel of the existence of the UCRS. (Tr. at 389). Both were aware that the UCRS was not and would not be communicated to the COCOTs on their monthly statements. (Tr. at 249, 325). Both were also aware that increasing the per-

centage holdback would cause a loss of COCOT customers. (Tr. at 244, 318–321).

■ The final element plaintiffs must prove is that defendants' participation was through a pattern of racketeering activity. Plaintiffs alleged that defendants utilized the mail to deceive them and that defendants deceived them by withholding information and monies multiple times over a multi-year period from 1995 to 1998. The Court has already held that such conduct, if proven, represents a pattern of racketeering activity. *Regency I,* 160 F.Supp.2d at 46. Furthermore, as noted *supra,* because the "predicate acts all stemmed from identical long distance service contracts between the parties ... the predicate acts are clearly 'related' and constitute a 'closed period of repeated conduct,' " *Id.*

■ A plaintiff alleging a violation of either mail or wire fraud statutes, 18 U.S.C. §§ 1341, 1343, must show that the defendant used the United States mail, a private or commercial interstate carrier, e.g. FedEx, or wires in furtherance of a scheme to deceive and defraud. Between August 1995 and November 1998, defendants both mailed monthly commission statements to plaintiffs using both the United States mail and commercial carriers (Tr. at 13, 95) and sent them over the Internet (Tr. at 68). These monthly commission statements were part of a scheme to defraud plaintiffs.

In 1995, defendants faced highly competitive market conditions (Tr. at 240, 347) and few alternatives for increasing profitability. Rising uncollectibles began to exceed the 8% holdback on all commissions that was retained as an offset for those uncollectibles. (Tr. at 243). Each monthly statement plainly displayed the 8% holdback rate and the reduced commissions were indicated as a column described as "net after uncollectible." (Pls.' Ex. 7). Cleartel considered raising the holdback

percentage on a going forward basis to compensate for the increased uncollectibles (Tr. at 244) but rejected this idea because 8% was the amount other competitor OSP's charged and defendants concluded that raising the holdback percent would result in lost COCOT customers. (Tr. at 244). Moreover, to increase the holdback percentage would require renegotiation of their contract and would likewise appear on the commission statements. Since contracts and commission statements were the main tools the salespersons of competitor OSPs used to prepare offers to potential COCOT customers (Tr. at 331) any means of recouping uncollectibles that did not alert the COCOTs would avoid the constraints of the competitive marketplace. As defendant Auger so revealingly stated: "the market put constraints on us and we had to try to find ways to accomplish our objectives." (Tr. at 272–73).

Instead, defendants opted to implement a charge they termed the UCRS. At the time of the implementation in August 1995 defendant Cleartel had over 600 COCOT customers. (Tr. at 140). Defendants claim that at the time of implementation they sent out a letter to all COCOT customers describing the UCRS and informing their customers of its impending start. (Tr. at 140). Yet defendants have never produced a copy of the letter, not an internal copy and no copy from any of their former customers. Moreover, defendants did not produce any former COCOT customers to testify that they had either received the letter or were otherwise aware of the UCRS. Mr. Koontz, a former COCOT customer testified as to the UCRS but he was more than a mere customer, he was also an employee of Cleartel. (Tr. at 159). He too could not find the letter. (Tr. at 161–62). The Court finds that such testimony, including that of defendants Auger and Groh, is not credible on this

point in light of the failure to produce a copy of the letter or introduce any witnesses not affiliated with Cleartel. The Court finds insufficient evidence to indicate that a letter was ever mailed to any COCOT customer and particularly finds that no letter describing the UCRS was ever sent to plaintiffs.

Defendants also failed to inform plaintiffs of the UCRS via their monthly commission statements and used these statements to further their scheme. When defendants implemented the UCRS the commission statements did not change in format to reflect this new charge or calculation of commissions without the UCRS. (Tr. at 324). According to section 2.4 of the contracts, the monthly statement was supposed to include a "summary of gross long distance calls, minutes, and charges by originating phone number." (Pls.' Ex. 2 at 2; Pls.' Ex. 3 at 2; Pls.' Ex. 4 at 2). The Court already found that defendants breached this section of the contract. *Regency I*, 160 F.Supp.2d at 40. But defendants' conduct represents more than a mere breach of contract. Instead, defendants engaged in a series of actions designed to prevent plaintiffs from discovering the existence of the UCRS. The UCRS charge was entered on the software program that produced the monthly reports by defendant Groh, yet defendants never made adjustments to the printed report to reflect this new charge. (Tr. at 324). Defendants claimed they never made this adjustment because the report was printed on paper with a preprinted format and that to add an additional column would have required substantial adjustments (Tr. at 325) but this fails to explain why defendants did not include the UCRS in the total charges column of the monthly report.

The UCRS was indisputably a charge assessed against end users and was al-ready a column in the program that calculated values for the monthly commission statement. Defendant Groh even admitted that the total charges column in the monthly report could have been adjusted to include the UCRS. Yet defendants did not modify this column and so concealed from plaintiffs the UCRS. (Tr. at 377–80).

Defendants' concealment is further shown by the manner in which defendants passed the charge on to end users. Defendants added the UCRS to the charge assessed against end users by modifying their tariff (Tr. at 371–72). In that modification they added amounts ranging from $0.25 to $0.50 to each of their operator handling charges. (Defs.' Ex. 10). Yet the amount of UCRS per call being assessed against plaintiffs was $0.78 per call. This discrepancy is not explained. One plausible inference is that it was defendants' software program that set aside $0.78 per call as UCRS and that it reduced the total charge reported to plaintiffs by that amount. If that operator handling charge had only been increased by $0.25 then the additional $0.53 cents would have been charges a share of which plaintiffs had previously received. Insufficient evidence exists to establish this point, but the inferences from such facts are clear.

A further inconsistency giving rise to an inference of conspiracy and deception is defendants' assertion that they implemented the UCRS in part to discourage COCOTs from charging large location surcharges. (Tr. at 245–46). Defendants, including both Groh and Auger, felt that sizeable location surcharges damaged the long-term viability of the pay phone business. (Tr. at 245–46). Defendants claimed they implemented the UCRS on a sliding scale so that larger locations surcharges would automatically merit a larger UCRS and vice versa. (Tr. at 245–46). Thus COCOTs that reduced their location

surcharge would see a reduction in the UCRS that in turn would result in smaller overall bills to end users that would in turn lead to increased call volume and a lower incidence of uncollected charges. But despite this claim and its well thought out rationale, defendants did not include a scale comparing the UCRS to the location surcharge on any of plaintiffs contracts, or in the attached "Schedule A" to either contract that set forth the amount of the location surcharge. (Tr. at 285). In fact, even after assessing the UCRS for several years, defendants' contracts, including its 1998 contract with Actel, still used prospective language to describe the UCRS rather than present tense language. Section 2.2 of the 1998 Actel contract (Pls.' Ex. 3) and the 1996 Regency contract (Pls.' Ex. 4) state "Cleartel reserves the right to implement an uncollectible cost recovery surcharge (UCRS) to recover actual uncollectible amounts ..." (Pls.' Ex. 3 at 2, Pls.' Ex. 4 at 2).

Moreover, defendants did not include a UCRS scale on the monthly commission statements sent to plaintiffs, though the 8% holdback was clearly displayed. (Pls.' Ex. 7). Finally, the Court observes that plaintiffs reported UCRS charges of between $0.50 and $1.00, but all of Actel's phones had a single location surcharge as did all of Regency's. Defendants do not explain why, if the UCRS operated on a scale tied to the location surcharge, a single location surcharge coincided with different UCRS. Again, the Court cannot reconcile defendants well scripted explanations with the routine pattern and practice of deceiving the plaintiffs as to the existence and amount of the UCRS.

In conclusion, all of the aforementioned acts, taken together, constitute a complex and multifaceted pattern of deception in the creation, use, and repeated sending of monthly statements through the United States mail. The Court finds that defendants Auger and Groh violated 18 U.S.C.1962(c) in that they acted with a specific intent to defraud and while employed by Cleartel, an enterprise under RICO, did participate in the management, operations, and conduct of Cleartel through a pattern of racketeering activity involving numerous separate acts designed to deceive plaintiffs and that these deceptive actions occurred in part in the design and use of the monthly commission statement, which was sent to plaintiffs through the United States postal service or private carriers. Furthermore, the Court finds that plaintiffs were directly injured in their business or property by reason of these violations and that the injury sustained by each is equal to the amount of actual damages each suffered by reason of the breach of contract by defendant Cleartel. Finally, the Court finds sufficient evidence to support a finding that defendants Auger and Groh conspired in their violation of 18 U.S.C.1962(c) and are therefore in violation of 18 U.S.C.1962(d).

## B. Damages for violation of RICO

According to 18 U.S.C.1964(c), having found liability against defendants Auger and Groh, the Court must award treble damages to plaintiffs. *See Resolution Trust Corp. v. S & K Chevrolet*, 868 F.Supp. 1047 (C.D.Ill.1994). The Court considers the treble damage award to be penal in nature and therefore not duplicative of the actual damages awarded the plaintiffs against Cleartel. The Court previously found that plaintiff Regency's actual damages were $25,580.27. The Court therefore shall award Regency treble damages in the amount of $76,740.81 against defendants Auger and Groh. The Court found Actel's actual damages were $23,147.22. The Court therefore shall award treble damages to Actel in the

amount of $69,441.67 against defendants Auger and Groh. Plaintiffs are further permitted to file a motion for reimbursement of the costs of the suit, including a "reasonable attorney's fee." 18 U.S.C. § 1964(c).

### CONCLUSION

The plaintiffs met their burden of proof as to damages on their breach of contract claim. The Court shall award plaintiff Regency Communications Inc. actual contract damages in the amount of $25,580.27 against defendant Cleartel Communications Inc. The Court shall award plaintiff Actel Inc. actual contract damages in the amount of $23,147.22 against defendant Cleartel Communications Inc.

The plaintiffs met their burden of proof on their claims under RICO, 18 U.S.C. §§ 1962(c) and 1962(d). The Court awards treble damages under 18 U.S.C. § 1964(c). The Court shall award damages to Regency Communications. Inc. in the amount of $76,740.81 against defendants Ulysses G. Auger and Barton R. Groh. The Court shall award damages to Actel, Inc., in the amount of $69,441.67 against defendants Ulysses G. Auger and Barton R. Groh. The Court also permits plaintiffs to submit a bill of fees and costs in accordance with 18 U.S.C. § 1964(c). A separate judgment shall issue this date.

### JUDGMENT

Pursuant to FED. R. CIV. P. 58 and in accordance with the Memorandum Opinion issued this date, it is this 18th day of February, 2004, hereby

ORDERED that JUDGMENT is entered against defendant Cleartel Communications Inc. and in favor of plaintiff Regency Communications Inc. in the amount of $25,580.27; it is

FURTHER ORDERED that JUDGMENT is entered against defendant Cleartel Communications Inc. and in favor of plaintiff Actel Inc. in the amount of $23,147.22; it is

FURTHER ORDERED that JUDGMENT is entered against defendants Ulysses G. Auger and Barton R. Groh and in favor of plaintiff Regency Communications Inc. in the amount of $76,740.81; it is

FURTHER ORDERED that JUDGMENT is entered against defendants Ulysses G. Auger and Barton R. Groh and in favor of plaintiff Actel, Inc. in the amount of $69,441.67; and it is

FURTHER ORDERED that plaintiffs may submit a bill of fees and costs in accordance with 18 U.S.C. § 1964(c).